Judge Marshall
delivered the opinion of the Court.
Judge Ewing took no part in the case, as he was not present at the hearing.
On the 11th of February, 1827, George Dryeir. advanced to Perkins four hundred dollars, and received from h™ two negro girls — Esther, about sixteen, and Amy, about fourteen years of age, for which a bill of sale was, at the same time, executed by Perkins, purporting to be a transfer of said slaves to Drye, for the consideration of four hundred dollars then received and one hundred ^°^ars to he paid in six months and fifteen days, with a waranty of soundness and title, and the following condition, viz. “And if said Perkins pay said Drye the “purchase money, with six per cent interest, at any “time between the present date and within six months, “said Drye binds himself to give up said negroes to “said Perkins. If any accident should happen to either «0f said negroes during the six months, it is to be con“sidered said Perkins’ loss, as by death &c. unless by “the exposure of said Drye.” And on the same day, Drye delivered to Perkins an instrument importing, that he had bought two negroes of him, which, if the bargain was complied with, he was at liberty to redeem at any time within six months. There is also upon the bill of sale of the 11th of February, a receipt, acknowledging the payment of the sum of one hundred dollars therein provided for, which, although attested by a subscribing witness, is without date.
On the 11th day of March, 1827, a second bill of sale was executed by Perkins to Drye, for a negro boy Samuel, about sixteen years old, for the consideration of one hundred and seventy-two dollars, acknowledged to have been then received, and containing the same *171 waranties of soundnesss and title as the first; reserving also the same right of redemption, with a similar provision as to the loss being born by Perkins in case of infirmity or death of the negro.
Bill for an ac- and to redeem the slaveSv
One slave sold to apurchaserwith°^notlce — post 179.
®ny" nfy was lent or the slaves gaged; and relying that the transaction wan a purchase, with an agreement that the vendor might repurchase them; which privilege he afterwards, upon a farther advance and final settlement, gave up, and made the absolute bill of sale.¡
■On the 5th of May following, Perkins executed an absolute bill of sale to Drye, for all three of the negroes expressed to be in consideration of seven hundred and seventy two dollars, in round silver, in hand paid. And which was attested by two witnesses, and recorded.
In December, 1829, Perkins filed his bill, praying for an account of the hire and increase of the negroes, and that he might be permitted to redeem, &c. He states that, being much pressed for money, he applied to Drye to lend at six per cent, which Drye agreed to do if he would give him alien upon some negroes; whereupon, four hundred dollars were advanced to him by Drye, on the terms stated in the bill of sale of February 11th, 1827, and the two negroes therein named taken into his. possession. That, shortly afterwards, being in want of more money, he borrowed from Drye the further sum of one hundred and sixtysix dollars, at the same interest, .and delivered Sam, by way of security. The second bill of sale exhibits the terms on which this second advance was made. He charges that, these bills of sale were looked upon as mortgages; that Drye never advanced any thing but the two sums above mentioned, and that the absolute bill of sale was given upon the understanding, that the time of redemption was to be extended to five years; but that Drye refuses to let him redeem, and has fraudulently sold one of the negroes. He exhibits the writing executed by Drye, on the 11th of February, as evidencing his right of redemption.
The father of Drye, who claims Esther and her childrenismade a defendant; who answers, insisting that he made a fair purchase without notice, &c.
George Drye jr. in his .answer, admits, that he has sold Esther, and that she has had two children. He denies, that he loaned the money to Perkins, or took the ’ J *172 slaves as a pledge or mortgage, but says he made a conditional purchase, the right being reserved to Perkins to repurchase them by a given time, as stated in the bills of sale of February and March. The answer then proceeds as follows: — “Some time after these transactions, “at the instance of the complainant, this respondent purchased a horse of complainant’s, at constable’s sale, “estimated by complainant to be worth one hundred dollars, which he let him have; he had also advanced to “complainant, some money, in addition to that paid for “the negroes, as above stated. These were all the “transactions between him and complainant, except “some personal service rendered complainant, in the “transaction of some business for him, an account of “which this respondent did not draw up, and he is unable “to state it therefore with any certainty. The complainant, however, being considerably harassed with “debt, and despairing being able to return the money “received by him as aforesaid, on the 5th of May, 1827, “it was agreed between him and complainant, that they “would close their transaction, and this respondent would “make a final purchase of the slaves, or more properly,, “the complainant agreed to give up his right to repurchase, and in consideration of the additional advances “made to him in money and the horse aforesaid, convey “absolutely the right to said slaves. On the date afore“said, accordingly, he and complainant made a full and “final settlement; whereupon, he was found and acknowledged himself indebted to this respondent, the “sum of seven hundred and seventy two dollars;” in consideration of which, he made the absolute bill of sale. On this bill of sale, the defendant relies-, as evidence of' his right; denies any agreement for extending the right, of redemption, and claims to hold the slaves absolutely.
The evidence.
It is proved that, the negroes Esther and Amy were worth about seven hundred dollars, at the date of the first bill of sale,'and that Samuel, named in the second, was worth near three hundred dollars. There is no proof of any advance of money by Drye to Perkins, except the four hundred dollars, and the one hundred and sevéntytwo dollars, (or as the complainant states it, *173 one hundred and sixtysix dollars,) advanced when the negroes were delivered, in February and March. The horse is proved to have been worth not more than forty-five dollars, and to have been purchased by Drye for about two-thirds of that sum, and left by him with the complainant. The evidence is silent as to any other transaction between them. Some testimony is taken in the cause to prove, and disprove, the ri'ght of redemption, by detailing the verbal statements of the parties; but more is devoted to the impeachment -and support of the character and credibility of the principal witness who has deposed for the complainant bn that point. We have not deemed it necessary to weigh with minuteness the evidence for and against his credibility; nor to ascertain the exact preponderance of the parol testimony in relation to the right of redemption. No witness appears to have been present wdien the terms of either of the contracts were discussed or settled between the parties; and there is enough in this case, without resorting to subsequent declarations or acts of the parties, to expose the real nature and essence of the transaction.
Deductions from the pleadings exhibits.
Where, upon an application for a loan of money, a party advances, it, upon property of much greater value being sold and delivered to him — the vendor reserving the right to repurchase by refunding the money with interest in a given time— the transaction is treated by the courts, as a loan upon security, #• a mere device to evade the statute of usury.
It is sufficiently apparent, from the bill and answer, as well as from the terms of the contracts of February and March, that Perkins was harassed with debts, and pressed for money. Did he want to borrow money, or was he desirous of raising it by the sale of his property? If the latter had been his object, he would have fared better to let his negroes be sold under execution,— which was the worst evil the law would have inflicted on him, than to sell them at a price so disproportioned to their value, as that which Drye was willing to allow. But he alleges that he applied to the defendant to lend him the money, which is not denied by the answer; and the reservation of the right of redeeming the slaves by repayment of the money, shews, not only that he did not wish to sell, but renders it highly probable, that he did not suppose he was selling them. The defendant denies that the money was loaned, and alleges that he made a conditional purchase of the negroes; he does not deny that a loan was applied for. The effect of *174 this is, that he refused to lend the money, but agreed to purchase the negroes at a price greatly below their value, and taking them into possession, allows the complainant the privilege of repurchase, within six months, upon paying the sum advanced with interest. He denies that this was a loan, or a mortgage. But such transactions upon treaties for borrowing money, have been determined by this Court to be usurious, which they could not be unless they were considered as loans, or as'mere devices to avoid the statute. Heytle vs Logan 1. Mar. 529; M'Ginnis vs Hart, 4. Bibb 329; Lindley vs Sharp, 7. Monroe, 248; Burt vs Bondurant, same 423, &c.
A stipulation in a bill of sale containing an agreementforredemption by the vendor within a certain time — that if the property sold perishes in the time, it shall be the vendor’s loss, authorizes the conclusion, that the transaction was in fact only a loan and mortgage- unless the vendee, on whom the onus lies, shows the contrary.
But what is the effect of the writing itself? Does it show that the negroes were sold to Drye, and that the money advanced by him was thenceforth the money of Perkins? The stipulation contained in each of the two first instruments, that any accident happening to the negroes before the time of redemption, should be the loss of Perkins, evinces satisfactorily to our minds, that notwithstanding the absolute words of transfer, the negroes were considered as belonging to Perkins, and the money to Drye. If the negroes had died within the six months, Drye would still have had a claim for the money. It is evident from this consideration, that they were taken as a security for the money, and that the instruments were therefore mortgages.
The opinion of this court has not, it is true, been uniform as to the effect of the agreement that one or the other party should sustain the loss. See Gray vs Prather 2. Bibb, 224; and Prather vs Norflet, 1. Mar. 178 &c. But if the circumstance, that Perkins, who parted with the slaves, was to sustain the loss in case of death within the period during which he had the right to redeem, ought not to be as decisive as in our opinion it' is, still the disposition uniformly manifested by the Court of Equity to construe a contract to be a mortgage in all doubtful cases, would bring us to the same conclusion with regard to the real character and effect of these conditional bills of sale. In accordance with this disposition, it was said, in the case of Edington &c. vs Harper, 3. J. J. Marshall, 356; that when ‘the written contracts *175 show an absolute sale by one to the other, and a simultaneous condition of defeasance delivered by the latter to the former,’ ‘the onus devolves upon the party who insists that the contract is a conditional sale;’ and that unless he exhibit some fact, in addition to the evidence of the written contract, to show that it was a conditional sale, he must submit to it as a mortgage. The same rule must equally apply in the present case, where the condition of defeasance is a part of the same instrument which evidences the transfer, and where there is also a separate instrument delivered to the vendor declaring his right to redeem. In this case, the party who insists that the contract is a conditional sale, bases his right and his evidence of right, upon the written contract alone. Every extraneous circumstance co-operates with the internal evidence exhibited by the writings themselves, as we have construed them, in support of the idea that this is a mortgage. The inadequacy of price, to which Perkins might well submit under the imnres- , , , , r , sion that he was merely mortgaging the property — the desire to raise money by loan rather than by sale — the unwillingness to part absolutely with his property, as evinced by the reserved right of redemption, and the agreement to sustain the loss in case of death or other accident befalling the slaves, — all concur in demonstrating that Perkins, at least, did not look upon the contract as any thing more than a mortgage of the property, to secure the repayment of the money; and, in the absence of every circumstance which might give a different aspect to the transaction, we think it was nothing more than a mortgage.
Recapitulation whiohtodtoestablish tht‘fla“11' bill of sale with aright ofredemption reserved to the vendor for a íime’, ™as onIy mortgage to secure a loan,
These considerations and the conclusion to which they have brought us, apply to each of the conditional bills of sale; the terms of each, as well as the transactions to which they belong, being substantially the same. Indeed though separated by the intervention of a few days, they might well be considered to be identical in their origin, as they in fact were in their intended termination, if it were not that the second contract,' as unequal and oppressive as the first, if regarded in any other light than as a mortgage, shows that the necessi *176 ties of Perkins, were such as rendered it scarcely proba,-» ble, that he would be able to redeem the slaves within the limited'time; and that Drye, contemplating this improbability, considering his contracts in form, as conditional purchases, to become absolute on the failure of Perkins to redeem within six months, and having already in his hands more than an equivalent for both the sums advanced, (on which he would in fact be owing one hundred dollars if not redeemed,) took advantage of the second application for money, to draw within his grasp upon another conditional purchase, a third negro, worth considerably more than the sum then to be advanced. These facts aid in determining the character of the transaction in all its stages, and cannot be disregarded in enquiring into the the real object and effect of the third bill of sale; which being absolute on its face, and without any‘simultaneous condition of defeasance,’ would, if effectual, according to its import, defeat the right of redemption before the time originally allowed for its exercise had half expired. The fact that a bill of sale, intended to have such an effect, was obtained at so early a period, and for nothing more than a colorable consideration, palpably inadequate to the object, would furnish such evidence of rapacity and oppression, if not of fraud, that we should hesitate long, before we should decide that the right of subsequent redemption had been lost, even if the first transaction had been a conditional sale, and not a mortgage.
their fairness ;and Mortgagee may extinguish mortgagor’s right of redemption, by purchase or contract with him; but the release must be upon a valuable and fair consideration.— The chancellor looks upon such dealings with a jealous eye, and requires proof of will set aside the contract, where it appears that the mortgagee, taking advantage of the mortgagor’s condition, obtained the relinquishment upon an inadequate consideration.
But the relation of mortgager and mortgagee being, in our opinion, clearly established between the parties, by the contracts of February and March, the question as to the character and effect of the contract of the 5th of May, which was engrafted upon the two first, and depended upon them for its consideration, is relieved of its greatest difficulty. The question now is, not whether parol evidence is admissible to convert an absolute bill of sale into a mortgage, nor whether the parol testimony in the record, is sufficient to show that it was intended *177 and understood by the parties to operate as a mortgage; but whether the bill of sale is itself sufficient to convert a pre-existing mortgage into an absolute estate, and thus to deprive the mortgagor of his equity of redemption. This question must be determined upon principle and authority applied to the facts of the case.
It is not to be denied, that it is competent for the mortgagor to extinguish his right of redemption by conveyance to the mortgagee; but it must be fairly done, in a transaction that will bear the light, and upon a consideration, the particulars of which, the mortgagee will be able at least to state, if not to prove. It would be strange indeed, if the Court of Chancery which so carefully guards the equity of redemption from all restraints that the parties may attempt to impose in the mortgage which creates it, or in any other cotemporaneous deed, should thenceforth abandon it to the arts or influence of the mortgagee, who, having already a hold upon the property by the original contract, comes into every new transaction with the mortgagor with increased advantage. We are aware that the opinion is advanced by a respectable writer on this subject, (1. Covantry's Powell, 122-4,) that the mortgagee is as free as any other person to deal with the mortgagor in regard to the equity of redemption, and that the Chancellor looks with no peculiar vigilance upon such dealings. But we apprehend the principle of the authorities, both ancient and modern, to be, that if the mortgagee purchase the equity from the mortgagor, it must be for a valuable, and a fair consideration; and that Courts view such transactions with jealousy “and will set aside such sales “ by mortgagor to mortgagee, where, by the influence of “ his encumbrance, the mortgagee has purchased for less “ than others would give.'' In the spirit with which a Court of Equity watches over the pecuniary transactions between individuals, one of whom is, by reason of his pecuniary relations to the other, in any degree subject to his control, it will not'1 only set aside a sale from the mortgagor to the mortgagee, if unfairly obtained, but will require, that the fairness of the transaction shall distinctly appear.
*178 In the case of Holridge vs. Gillespie, (2. John. Ch. Rep. 34,) in which the mortgagor of a lease had, upon some slight or pretended consideration, given up one half of the farm to the mortgagee, by an agreement subsequent to the mortgage, in which he acknowledged the receipt of one hundred dollars, as the consideration of the new contract, Chancellor Kent decides, that this agreement ought to form no obstacle to the redemption of the whole. “That agreement (he says) bears marks of un- “ due influence, growing out of the first assignment; and “ contracts of that kind, made with the mortgagor, to “ lessen or embarrass the right of redemption, are re- “ garded with jealousy, as they are very apt to take “ their rise in unconscientious advantages assumed over “ the necessities of the mortgagor. (1 Vern. 8; 2 Vern. “ 520; 2 Atk. 495; 2 Ball and Beatty, 278.) The general “principle is “once a mortgage always a mortgage;” “ and though no doubt, the equity of redemption may “ be released upon fair terms, yet the fairness and value “ must distinctly appear. The agreement was false on “ its face, for no consideration was paid. A payment of “ the annual rent to the landlord, was no compensation “ to the plaintiff for half of his farm; and if we can “ credit the subsequent declarations of the defendants, “ they regarded the whole farm as still subject to re- “ demption. But without placing reliance on sayings of “ this kind, the paper itself, accompanied with the ad- “ mission that the consideration was never paid to the “ plaintiff, is enough to justify me in not regarding that “ agreement as a valid obstacle to the original right of “ redemption.”
These principles, consonant with the character and practice of a Court ofEquity, are decisive of the present case. What compensation did Perkins receive for the valuable right of redeeming, from an encumbrance of five hundred and seventy-two dollars, three slaves worth nearly one thousand dollars, and increasing annually in value? A horse worth forty or fifty dollars, but which can only be charged at thirty dollars — the price bid for him by Drye, and some money, and some personal services in transacting some business. And these items make up *179 the two hundred dollars additional advance, which added to the five hundred and seventy two dollars for which the mortgage was given, forms the nominal consideration of seven hundred and seventy two dollars, for which the absolute bill of sale of 5th of May was executed. The money and the personal service, the amount and value of which the mortgagee himself can only designate by the indefinite prefix ‘some,’ must, in estimating the value and fairness of the consideration on which this release of the .right of redemption is supported, be set down at nothing. The sum of one hundred dollars mentioned in the first bill of sale, and for which Drye seems to have procured a receipt attested by a witness, is not alluded to in his answer, nor pretended to have been paid. No witness has testified to the payment of a cent; and it is worthy of observation, that, although every writing which bears evidence in support of Drye’s title to the slaves, is attested by one or more witnesses, no individual seems to have been present when a dollar of money was advanced, or when the terms of either contract were explained between the parties.
Allegations in chancery pleadings, that some money was ad-van ced;some ser vices performed, aretoo indefinate and not to be regarded.
Mannerin which the accounts are to be made up, upon a decree allowing a redem ption of slaves pledged to secure a loan. — One a femalebeing sold by the mortgagee,to a purchaser who had no notice ofcompt’s equity, the mortgagor has a decree for the value of that one and her increase, at the time of the assessment.
It is unnecessary farther to recapitulate the facts.— There is scarcely a colorable consideration for the absolute bill of sale; like the receipt, it is false upon its face. Executed by a mortgagor harassed with debts, and despairing of being able to redeem, it bears, when coupled with the admissions of the defendant, plain marks of undue influence growing out of the first mortgage, and of an eager desire on the part of Drye, to defeat the right of redemption. There was no real compensation for that right; no fair value; nothing by which, in equity and good conscience, it can be considered as extinguished.
It follows, that the decree of the Circuit Court, dismissing the bill, was erroneous; and that Perkins is entitled to redeem the negroes, and to have an account taken of then hire since they came to the possession of Drye; and also, of the value, at the time of assessment, of Esther and and her children, who are in the possession of George Drye, senior, by purchase, without notice of Per *180 kins’ right; and if, after charging him with the advances made by George Drye jr. (including the value of the horse,) with interest, and with the reasonable cost of raising the young negroes, any balance should appear against him, day should be given for payment thereof; and on failure of payment, the remaining negroes, or such of them as it ma.y be necessary to sell, should be sold to pay the balance, so appearing against him. But if, on taking the account as above directed, there should appear to be nothing due to Drye, the remaining negroes, with their increase, should be surrendered to Perkins immediately, or the value of such as may not be had should be decreed to be paid to him; as should any balance which may appear against George Drye jr. on stating the account, as above directed.
The decree is reversed, and the cause remanded, with directions to enter a decree in conformity with this opinion.