## Brock *versus* Savage.

Where one man pays the purchase-money to the state, and he and those claiming under him have the lands assessed, pay the taxes, and exercise acts of control and ownership over them; patents taken out by the party who made the application, will enure to the benefit of him who paid the purchase money, although more than twenty-one years have elapsed since the patent issued.

But where the equitable owner lays no claim to the land, pays no taxes, and exercises no acts of ownership over it for more than twenty-one years after another takes out a patent for it, his equitable title will be conclusively barred in favor of the patentee: Strimpfler *v.* Roberts, 6 *Harris* 298.

The mere neglect of the equitable owner to pay to the parties who made the application for him, the whole sum stipulated for discovering the land, and having the surveys made and returned, would not transfer his title to them, nor authorize them to take out patents in their own or another's name, and hold the land.

Subject to the rights of the equitable owner, such parties might take out patents, and hold them as security for the amount due.

But to make such lien available, where it has not been admitted, it must have been asserted by suit, or by taking possession of the land within twenty-one years, or else it will be presumed to have been paid.

The possession necessary to bar such a claim, need not be such possession as would give title to a trespasser under the statute of limitations, but a possession according to the nature of the thing possessed, under a contract relation, continued until the presumption of law or the statute bars the remedy, and presumes the duty owed to have been paid, released, or abandoned.

ERROR to the Common Pleas of *Huntingdon county*.

This was an action of ejectment by John Penn Brock against John Savage, to recover the possession of a tract of land in Union township, Huntingdon county, warranted in the name of Mary Fred, containing four hundred acres. He showed the warrant

[Brock v. Savage.]

and survey, and a patent dated 25th Dec. 1796, to Charles Young, reciting a deed poll from the warrantee.    He also showed a regular chain of title from the patentee to himself.

The defendant claimed the land under the same original title, and proved that on the 15th, 18th, 21st, and 24th March 1794, ninety-six warrants were issued upon applications of Arthur Chambers and John McNutt, for lands in Huntingdon county, of which the tract in dispute was one.    And on the 29th March 1794, James Wilson of Philadelphia, and Chambers and McNutt, entered into the following article of agreement:—

"Articles of agreement indented, made the twenty-ninth day of March, in the year of our Lord one thousand seven hundred and ninety-four, between Arthur Chambers, of Huntingdon county, in the state of Pennsylvania, and John McNutt, of the same county, in the said state, of the one part, and James Wilson, of the city of Philadelphia, Esquire, of the other part: Whereas, the said Arthur Chambers and John McNutt have entered in the land office of Pennsylvania, applications for ninety-six tracts of unlocated land, each for four hundred acres, in Huntingdon county, containing in the whole thirty-eight thousand four hundred acres, in the names of the following persons, to wit: [here follow the names of the 96 warrantees,] the warrants being now issued or about to be issued for surveying the same, all which lands the said Arthur Chambers and John McNutt have bargained and sold to the said James Wilson, on the following terms: that they, the said Arthur Chambers and John McNutt, shall and will on or before the first day of August next, at their own expense, procure from the several persons aforesaid, whose names have been made use of in the said warrants, deeds for all the said lands to the said James Wilson in fee, and also survey or cause to be surveyed all the said lands, and pay for the provisions, chain carriers' and markers' wages, and every other expense attending the surveying the same; and after the said lands have been so surveyed, have the same returned to the surveyor-general's office, and patented to the said James Wilson in fee simple.    In consideration whereof, the said James Wilson doth hereby covenant, promise, and agree to pay, or cause to be paid, the purchase money to the state, and office fees for the said tracts, and to the said Arthur Chambers and John McNutt the sum of twenty shillings per tract for provisions, chain carriers', markers' wages, and every other expense attending the surveying the same; and when the returns of survey are all made to the surveyor-general's office, clear of disputes and ready for patenting, then he, the said James Wilson, shall and will advance and pay all the surveying and patenting fees; and after all the said patents are obtained in manner aforesaid, and legally recorded in the Rolls' office, then he, the said James Wilson, shall and will farther pay or cause to

[Brock *v.* Savage.]

be paid to the said Arthur Chambers and John McNutt nine pence per acre, at the following times, viz.: one-fourth part thereof at the delivery of the patents, and the residue in two years from that time, with lawful interest, excluding the allowance of six per cent. for roads, to be ascertained and fixed by the patents and surveys. And, for the true performance of all the covenants and agreements aforesaid, the said parties hereto do mutually bind themselves, their heirs, executors, and administrators, each to the other of them, in the penal sum of ten thousand pounds, firmly by these presents. In witness whereof, the said parties have interchangeably set their hands and seals hereto, dated the day and year first above written."

The receipt of Chambers and McNutt, endorsed on the day of its date, for £96. And another of John McNutt, on the 22d May 1796, for $20. The purchase-money and office fees of these tracts were paid by James Wilson, as shown from the receipts and the books of the land office. On the 20th August 1796, James Wilson and wife made the following conveyance to Benjamin R. Morgan, and which was recorded in Huntingdon county :—

"This indenture, made the twentieth day of August, in the year of our Lord one thousand seven hundred and ninety-six, between James Wilson, Esq., and Hannah, his wife, of the city of Philadelphia, of the one part, and Benjamin R. Morgan of the same place, of the other part, witnesseth: that the said James and Hannah, for and in consideration as well of certain debts due and becoming due from said James to Henry Lee, Esq., of Westmoreland, in the state of Virginia, and the said Benjamin, as for ten pounds by the said Benjamin to the said James paid, the receipt whereof is hereby acknowledged, have granted, bargained, sold, aliened, enfeoffed, released, and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff, release, and confirm unto the said Benjamin R. Morgan, his heirs and assigns for ever, all the lands, tenements, and hereditaments, rights, properties, and demands of the said James, together with all his estate, right, title, and interest of, in, to, and out of, all and every the lands held by or to which the said James has a legal claim, within the counties of Northampton and Huntingdon, (his estate at and contiguous to Wilsonville, containing about one hundred and fifty thousand acres, only excepted); to have and to hold the same to him, the said Benjamin, his heirs and assigns for ever, under the special trust, confidence, and conditions following: that is to say, he, the said Benjamin, shall, within four months after the said James shall have furnished to him the requisite papers, descriptions, drafts, and evidences of title respecting the said lands, select therefrom such part as at a reasonable price, to be agreed on between the said James and Benjamin, will amount to double the value of the whole of the debts then existing from the said

[Brock *v.* Savage.]

James to the said Henry and Benjamin; but if they cannot agree in a valuation of the said lands, then the same shall be estimated at such price as shall have been fixed by the said Benjamin; provided that the said James shall, at any time within thirty days after being notified of the valuation made by the said Benjamin, be entitled to a reconveyance of all the lands hereby granted, on his paying and satisfying to the said Benjamin, the whole amount of debts then existing from him to the said Henry and Benjamin, and the expenses incurred by them in selecting and conveying the lands hereinbefore mentioned. But if the said James shall not pay the amount of the existing debts then due to the said Henry and Benjamin, within the time above mentioned, then the said Benjamin shall reconvey to the said James all the said lands, excepting the quantity so as aforesaid selected, and shall in like manner reconvey to him, within three months after patents shall have been obtained for the quantity so selected, such part thereof as he, the said Benjamin, may think fit, as at the said valuation shall remain, after satisfying all the debts of the said James to the said Henry and Benjamin, and all the necessary expenses of making such selection and completing the titles and conveyances respecting the same, he, the said James, at the same time executing such further deed, contract, or warranty, as may, by the said Benjamin, be requested respecting the quantity so as aforesaid retained by him. In witness whereof the said parties have hereunto interchangeably set their hands and seals, the day and year first above written.''

On the 26th and 27th of December 1796, sixty-eight of these tracts were patented to Charles Young, reciting deed poll from the warrantees to Chambers and McNutt respectively, and by them to Young. In 1800, these lands, with others belonging to Wilson and claimed to be included in the conveyance to Morgan, were assessed with taxes, and the taxes were regularly paid by Morgan or his agents. In 1803, the tract in dispute was omitted from the list, and does not appear to have been assessed again with taxes until 1844, when it was put upon the list at the suggestion of Jacob Cresswell, Esq. In 1801, Morgan, by letter of attorney, constituted John Cannon his agent in reference to these lands. He continued to act as such until after 1820. And on the 16th Dec. 1824, Thomas Jackson was constituted the attorney in fact for Morgan. Charles Young, the patentee, died in 1803, leaving issue an only son Charles Young the 2d. Charles Young the 1st had assigned or conveyed five of the 68 tracts patented to him, to Edward Thursby and Hugh Holmes, merchants of the city of Philadelphia, and on the 30th March 1808, they and Morgan, reciting the agreement between Chambers and McNutt and Wilson, and the conveyance of Wilson and wife to Morgan, entered into a submission, in which they referred to the referees

named, to "consider and determine whether the said patents were rightfully issued to the said Charles Young, and whether the lands therein described, are, by virtue thereof, and of any sufficient legal or equitable conveyance from the said Arthur and John, or from the said James Wilson to the said Charles Young, and of his said assignment, now, of right, vested in and belonging to the said assignees; and to deliver up to the party in whose favor such award may be, all patents, conveyances, and title papers relating solely to the said lands, and also to execute such releases, deeds, or transfers, as may be directed by the said referees as necessary to extinguish or convey all the title of the party against whom such award may be given, and vest it in the other; and they hereby further bind themselves to each other in the penal sum of one thousand dollars, to be forfeited and paid by either party neglecting or refusing to perform such award as said referees, or any two of them, shall make to the other. In witness whereof, the said parties have hereunto set their hands and seals this 30th day of March MDCCCVIII."

On the 30th May 1809, the referees made the following award:—

"We, the subscribers, in a written agreement bearing date 30th March, 1808, (between Hugh Holmes and Edward Thursby, of the city of Philadelphia, merchants, of the one part, and Benjamin R. Morgan of said city, attorney at law, of the other part,) to whom were referred the claims of the said parties to five certain tracts of land in the county of Huntingdon, state of Pennsylvania, held under warrants to Frederick Sills, Henry Sills, Andrew Sills, John Shaver, and Tempey Shaver, dated 18th March 1794, having carefully examined and maturely considered those claims respectively, do award the lands in question to the said Benjamin R. Morgan, and that the said Hugh Holmes and Edward Thursby deliver all the patents and title papers of said lands in their possession to the said Benjamin R. Morgan, and execute such releases, deeds, or transfers of the same as may be necessary to extinguish all their claim to the same, and vest it in the said Benjamin R. Morgan; he paying all costs of the patents, title papers, and releases, agreeably to the stipulation of the said parties in article aforesaid.        FRANCIS JOHNSTON,
                                    SIMON GRATZ,
                                    EDWARD LYNCH."

On the 25th June 1813, Charles Young the 2d, by his indenture of release, reciting therein the conveyance from Wilson and wife to Benjamin R. Morgan, the agreement between Chambers and McNutt, and Wilson, and that a part of the lands had been issued to his father, Charles Young, deceased, and the submission and award between Morgan and Thursby and Holmes, and that the title papers to the five tracts had been delivered over by

[Brock *v.* Savage.]

Thursby and Holmes to Morgan, he, " In consideration of the premises, and of the payment to me of the patenting and recording fees on twenty-five of the said patents in the name of the said Charles Young, deceased, now held by me for that number of tracts, part of the said land, by the said Benjamin R. Morgan, the receipt whereof is hereby .acknowledged: have assigned, released, transferred, and set over, and by these presents do assign, release, transfer, and set over unto the said Benjamin R. Morgan, his heirs and assigns, all my right, title, interest, claim, and demand, to, in, and out of the said twenty-five patents and the lands therein contained, amounting in the whole to ten thousand four hundred and eighty acres and three perches, in the county of Huntingdon aforesaid, which said patents are of the dates and in the names of the warrantees following," &c.

Cannon, after his appointment as agent, paid the taxes and made a sale of two tracts in 1816, to Joseph Norris. After his death in 1824, Thomas Jackson becoming the agent and attorney in fact of Morgan, made various sales of tracts of these lands to different persons, and paid the taxes for Morgan. And on the 21st March 1833, he entered into an agreement in writing with John Thompson, agent for John Savage, the grandfather of the defendant, for the sale of 31½ tracts, part of the 96 tracts embraced in the agreement between Chambers and McNutt and Wilson. And on the 22d September 1834, Benjamin R. Morgan conveyed by his deed of that date, 33 of the tracts mentioned in Chambers and McNutt's agreement, and including the Mary Fred tract, being the land in dispute together with 39 other tracts, not in McNutt's agreement. At the time of the sale by Jackson in 1833, a survey was made by running the exterior lines of about 12,000 acres including the Mary Fred tract. At the time of the sale, Savage took possession of the body of lands, and on the western part erected a forge, saw-mill, and a number of dwelling-houses for workmen. These buildings were at the junction of three tracts of the body of lands, but no clearing or improvement was made on the Mary Fred tract. Timber for the mill and for coaling purposes was cut on various part of the land, and the taxes have been regularly paid by Savage since his purchase. The plaintiffs alleged that the three tracts on which the forge and other improvements by Savage were made, were severed from the body of the lands, and from the tract in dispute, by lands conveyed by Morgan to Norris in 1816, and to Trexler in 1813.

The plaintiff presented the following points :—

1. That the plaintiff having a perfect legal title, is entitled, under the evidence in the cause, to a recovery of the land mentioned in the writ of ejectment.

2. That any equity created in Judge Wilson by the entry in the Old Purchase Blotter of the payment of the purchase-money

by him, was extinguished by the lapse of twenty-one years from the date of the patent to Charles Young, in the absence of actual possession, or the institution of an action of ejectment.

3. That the agreement of 29th March 1794, between Arthur Chambers, John McNutt, and James Wilson, was in the nature of an executory contract, under which Wilson acquired an equity in the lands referred to, to the extent of the amount of the money actually paid, which was lost by reason of the non-compliance of the conditions to be performed on his part.

4. That Wilson was bound by the terms of the agreement to pay Chambers and McNutt the amount of fees, as well for surveying and returning the ninety-six tracts, prior to the issuing of the patents, as the patenting fees, and one-fourth of the additional purchase-money, to said Chambers and McNutt, upon the delivery of the patent; in default thereof, the vendors had the right to rescind the agreement.

5. That there is no evidence that Wilson paid or offered to pay McNutt and Chambers the amount of fees for surveying, returning, and patenting, nor of the remaining unpaid purchase-money due Chambers and McNutt; and therefore they had the right to rescind the agreement of 1794.

6. That the conveyance from Wilson to Morgan of 20th August 1796, is in the nature of a mortgage to secure the indebtedness of Wilson, to Lee and Morgan, and therefore conferred no title upon Morgan otherwise than as mortgagee; and after the lapse of twenty-one years, the same was presumed to be paid and satisfied.

7. That if Wilson failed to comply with his covenant, in the agreement of 1794, either from refusal or inability, the vendors in said agreement had the right to disregard and rescind it, and Wilson could not substitute, without the consent of the vendors, his assignee in the place of his own personal responsibility; and that the subsequent conveyance from McNutt to Young, connected with the embarrassment of Wilson, raises a presumption, after the lapse of time, that the contract was rescinded.

8. That the submission to referees, the award and subsequent releases and conveyances by Thursby, Holmes, and Young, of thirty tracts to Morgan, is evidence of a compromise and settlement of the claims of the respective parties, and a surrender and relinquishment by Morgan to Young, of any legal or equitable claim to the remainder of the tracts patented to said Young; and if the jury believe the same, the plaintiff is entitled to recover.

9. That the actual entry upon part of the lands in 1833 or 1834, did not revive the extinguished equity of Wilson or Morgan; and if there is any efficacy in said entry or possession, it could only be available under the Statute of Limitations.

10. That if the jury believe that Savage made such entry upon

[Brock v. Savage.]

parts of surveys, in the names of Peter Shaver, Tempey Shaver, George Prough, and Hans Morrison, by the erection of the buildings testified to by the witnesses, he would be protected by the Statute of Limitations, only to the boundaries of the lines of those surveys.

11. That all the evidence of the exercise of acts of ownership, from 1796 to 1833, either by Wilson or Morgan, did not interrupt or prevent the extinguishment of their equity, acquired under the agreement of 1794.

The court below (TAYLOR, P. J.) answered these points in the negative, and directed the jury to find for the defendant.

The plaintiff sued out this writ, and *inter alia* assigned that the court below erred in answering these points in the negative, and in the instruction to find for the defendant.

*S. Linn* and *J. Hoffman* (with whom was *R. B. Petriken*,) for plaintiff in error.—The court below construe the McNutt agreement to be a contract to perform services and not to sell lands. Then Wilson's position is precisely that of Benson in Strimpfler *v.* Roberts, 6 *Harris* 300. The effect of paying the expenses and superintending the survey is destroyed by the subsequent acts of hostility. Payment of taxes is not sufficient to take it out of the ruling in that case. There is no act of ownership over the tract or any other tract of the body until 1824, except the sale by Cannon in 1816 of one of the tracts released in 1813, by Charles Young the 2d. Such an act of ownership would amount to nothing: 6 *Harris* 300. But McNutt and Chambers had an interest in the land. The applications gave them an inchoate or inceptive title to the land entered: Phillips *v.* Shaffer, 5 *S. & R.* 215. It was at least equal to that of a purchaser at sheriff's or treasurer's sale, before payment of the purchase—an interest which the party can sell or bind by the lien of a judgment: Morrison *v.* Wurtz, 7 *Watts* 437; Stoever *v.* Rice, 3 *Wh.* 24; Carkhuff *v.* Anderson, 3 *Binn.* 4; Johns *v.* Rush, 2 *Harris* 341; Hoyt *v.* Koons, 7 *Id.* 279; Robb *v.* Mann, 1 *Jones* 305.

The agreement was not to perform services, but an executory agreement for the sale of land: Chew *v.* Barnet, 11 *S. & R.* 392; Chew *v.* Parker, 3 *R.* 296: and Morgan took Wilson's interest subject to all countervailing equities.

The only effect of the recital in the release from Young to Morgan in 1813, is to admit notice of Morgan's claim and its foundation. But this notice came too late seventeen years after he purchased and after a descent cast. He had taken it discharged of the trust: Bracken *v.* Miller, 4 *W. & S.* 102. This recital cannot be set up as an estoppel, the party making it does not claim under it: Rogers *v.* Walker, 6 *Barr* 375.

It was for the jury, and should have been submitted to them,

VOL. VII.—27

[Brock *v.* Savage.]

whether the release was intended as a full compromise and settlement.

Whether Young did not relinquish his title to the thirty tracts and Morgan his claim to the balance: Hobart *v.* McCoy, 3 *Barr* 419; Jones *v.* Wood, 4 *Harris* 39; Myers *v.* Hart, 10 *Watts* 105. Recitals are reciprocal. If they estop Young they equally affect Morgan, as limiting his claim to the thirty tracts: Blight's Lessee *v.* Rochester, 7 *Wheat.* 535; Carver *v.* Jackson, 4 *Peters* 83–87; Crane *v.* Lessee of Morris, 6 *Id.* 611.

The conveyance from Wilson to Morgan, was a mortgage. It was given as a security for debts due and to become due. 1st. The lands to be selected were to be of double the value of the amount of debts. 2d. A reconveyance is provided for. 3d. It is expressed to be "*under the special trust and confidence.*" 4th. The parties themselves call it a "*contract.*" 5th. The conveyance would not vest the lands in Morgan, as other creditors were to be paid. 6th. Wilson was to have a reconveyance upon certain conditions. 7th. A further conveyance was to be made by Wilson for the lands retained. Being once a mortgage, it would remain so: Colwell *v.* Woods, 3 *Watts* 188; Kerr *v.* Gilmore, 6 *Watts* 405; Jaques *v.* Weeks, 7 *Watts* 268; Hiester *v.* Maderia, 3 *W. & S.* 388; Moyer *v.* Schick, 3 *Barr* 248; Brown *v.* Nickle, 6 *Barr* 391; Stoever *v.* Stoever, 9 *S. & R.* 434; Wharf *v.* Howell, 5 *Binn.* 499. And being a mortgage, the debt is presumed to be paid after 20 years: Rickert *v.* Madeira, 1 *Rawle* 328; Sailor *v.* Hertzog, 4 *Wh.* 267; Erb *v.* Scott, 2 *Harris* 22; Webb *v.* Dean, 9 *Harris* 29; 47 *Law Lib.* 100; 7 *Tenn. Rep.* 4, and 628; 8 *Id.* 122.

Poverty or insolvency will not rebut the presumption. Sellers *v.* Holman, 8 *Harris* 321; Kline *v.* Kline, *Id.* 508; Power *v.* Hollman, 2 *Watts* 218. If any title remained in Wilson's heirs, they cannot set it up without proof of the compliance with the agreement made by Judge Wilson with Chambers and McNutt, or an offer to do so. But having made no claim for more than forty years after the mortgage was presumed to be paid, it is too late now under the decision in Strimpfler *v.* Roberts, 6 *Harris* 300.

*Parsons* and *McAllister* (with whom were *Miles* and *Dorris,*) for defendant in error.—It is the settled law in this state, that where one man pays the Commonwealth for land, and the warrant is taken in the name of another, the latter holds the legal title for him who paid the purchase money: Cox *v.* Grant, 1 *Yeates* 166; Fogler *v.* Evig, 2 *Id.* 119; Cluggage *v.* Duncan, 1 *S. & R.* 117; Lynch *v.* Cox, 11 *Harris* 265. The same rule prevails in regard to the patent. The party who takes it out holds it for him who has the right: Duer *v.* Boyd, 1 *S. & R.* 210; Wolf *v.* Goddard, 9 *Watts* 547; Urket *v.* Coryell, 5 *W. & S.* 60.

[Brock v. Savage.]

While these cases are not denied to be law, it is contended by the plaintiff in error that a different doctrine is laid down in Strimpfler v. Roberts, 6 *Harris* 300. The only modification is, that the right of the *cestui que trust* will be barred after 21 years, unless he take possession or bring ejectment, where there is nothing but the naked and solitary fact of the payment of the purchase-money. But, says the chief justice, *where the cestui que trust has superintended the survey and paid the officers' fees, or executed other acts of ownership over the land, the presumption in favor of the trustees would not begin to arise until he did some act of hostility, such as selling the title or taking a patent to himself.*

Wilson, in this case, paid the purchase-money to the state, bought from Chambers and McNutt the right which they claimed as discoverers of the land, reciting that the name of Mary Fred, whether a real or fictitious person, was used to obtain the warrant, and that she had no interest in the land; that he paid £96,29th March 1794; on 20th May 1796, $20 more. McNutt in violation of his contract, took the deed from the warrantee to himself. Wilson paid all that was due from him until the patents were issued. In August 1796, Wilson sold the lands to Morgan. In December of the same year, the patents were issued to Young, and neither he nor any one under makes any claim to the land till 1853. Those claiming under Wilson have paid the taxes on this body of land since 1800. The acts of the *cestui que trust* have been hostile to the trustee from the first.

By the release of 25th June 1813, reciting the contract of McNutt and the deed to Morgan, Young is bound and estopped from setting up an adverse title. Our case comes therefore directly within the principle laid down by C. J. BLACK in Strimpfler v. Roberts.

That these recitals estop Young and those claiming under him, they referred to Burkart v. Bucher, 2 *Binn.* 455; 1 *Greenl. Ev.* p. 26, § 23; Carver v. Jackson, 4 *Peters Rep.* 83; Crane v. Morris, 6 *Id.* 611; Penrose v. Griffith, 4 *Binn.* 235; Morris v. Vanderen, 1 *Dall.* 67; Garwood v. Dennis, 4 *Binn.* 327; Stoever v. Whitman, 6 *Id.* 416; James v. Letzler, 8 *W. & S.* 192; Meals v. Brandon, 4 *Harris* 225; *Sch. & Lef.* 315. These recitals all show that Morgan claimed the land under Wilson, the *cestui que trust*, and amount to a surrender by Young of the title acquired by the patents, and this was within 31 years after the warrants had issued and while the trust remained in full life. They bring the case fully within the exception laid down in Strimpfler v. Roberts.

Wilson had complied with part of the Chambers and McNutt agreement. No more was to be paid until the patents were taken

out for him. This was never done; but the deeds poll taken to themselves in direct violation of the contract.

Whether the deed from Wilson to Morgan was a mortgage or not was immaterial. The mortgagee was in possession. The plaintiff did not claim under the mortgagor nor his heirs. And after 20 years, a mortgagee in possession will be presumed to have settled the title: 1 *Pow. on Mort.* 361, 397, 369, and 392; 3 *Johns. Ch. Rep.* 129; 3 *Pow.* 1154; 2 *Binn.* 471.

The opinion of the court was delivered by

LOWRIE, C. J.—The history of these titles, so far as it is important here, commences with the contract in 1794 by Chambers and McNutt to obtain for Wilson patents for ninety-six tracts. These tracts are all united by this contract into one subject-matter as between the parties; and to understand their history we must regard them as a unit, and divide them only as we find the parties dividing them. How have the parties dealt with the subject-matter of their contract, will be found a very important question in this case; and it is a natural suggestion of common sense, as it was in Jackson *v.* Lunn, 3 *Johns. Cases* 109, a case which bears a strong likeness to this in many particulars.

The applications for all the warrants were made by Chambers and McNutt, but the purchase-money on them all was paid by Wilson, and therefore in equity the title to the warrants belonged to him: *Jones' Land Office Titles*, § 73. The contract of 1794 is therefore a contract by Chambers and McNutt to complete the title by having the surveys made and the patents taken out in the name of Wilson, and by Wilson to pay them the expenses thereof, and the stipulated compensation for discovering the lands.

It may be admitted that, subject to Wilson's right, Chambers and McNutt might take out the patents in any name they pleased, and hold them as security for the amount due them. We need not say whether they might rescind the contract or not, and hold the patents for themselves on Wilson's default in paying the expenses; for certainly there is no evidence that they ever did rescind. Mere neglect by him to pay the expenses did not transfer his title to them. Lapse of time does not of itself dissolve a contract, without reference to which was the active and which the inactive party in the transaction. The patents belong to those who in equity were at first entitled to them or who have since become so: *Jones' Land Office Titles*, § 78.

This brings us to the question now to be looked into; not merely by the direct light of the original facts and documents, for, in over half a century, much of that has faded away; but also by the reflected light cast upon the subject by sixty years' conduct of the parties in relation to it.

Wilson unquestionably had a title to the lands by paying the

[Brock v. Savage.]

state for the warrants; and the question which the plaintiff has to meet is, whether the Wilson title has been so continued and asserted by him and those claiming under him, as to have maintained its validity or acquired additional force as against the patentee; and this question sets aside several points of the plaintiff as irrelevant.

Hence it becomes unimportant whether the conveyance from Wilson to Morgan was a mortgage or not; while it is important how Wilson and those claiming under him have dealt with the land. If it is uncertain what lands passed under the deed of Wilson to Morgan, it is important, as an assertion of the Wilson title, to know what lands Morgan claimed and controlled under it. These facts are not set up against the Wilson title, but in support of it against the patentee's interest in the title.

In Strimpfler v. Roberts, 18 *State Rep.* 298, the books of the Land Office showed that the price had been paid to the state, not by the patentee, but by another, and hence a resulting trust was presumed. But the apparent equitable owner laid no claim to the land, paid no taxes, exercised no acts of ownership, and manifested no consciousness that he had any title, for more than twenty-one years; and hence his presumptive title was conclusively barred in favor of the patentee: 2 *Spence's Eq. Jur.* 62, 709.

This is a mere execution of the principle that bars a mortgagor's equity of redemption, when the mortgagee has been in possession for twenty-one years after the time of payment, if nothing has taken place between the parties showing that the original relation is still kept up: 1 *Pow. on Mort.* 380–390; 3 *Id.* 1153–1155; *Mathews Pres. Evid.* c. 18; 9 *Wheat.* 489; 10 *Id.* 169; 3 *Johns. Ch.* 129; 1 *Paige* 48; *Mathews,* p. 209; and that presumes the conveyance of a trust estate.

And the same principle is applied to personal claims, changing the period of limitation according to the subject-matter. Mr. Story (1 *Eq. Jur.* § 55) states the rule as administered in equity thus: " In cases of equitable titles to land, equity requires relief to be sought within the period in which ejectment would lie; and in cases of personal claims, within the period prescribed for personal suits of a like nature:" *Id.* § 529; 2 *Id.* § 1520, 1521; 2 *Atk.* 303; 1 *Dana* 282; 1 *Rep. in Ch.* 70; *Prec. in Ch.* 518; 24 *State R.* 52; 25 *Id.* 154; 23 *Id.* 371; 7 *Johns. Ch.* 90; 20 *Id.* 576; 5 *Mass.* 143.

And this limitation may be shorter in equity cases than the statutory period, when the inconvenience or evil is trifling, and the neglect manifest; as when the money advanced on the faith of a mortgage is equal to the value of the property, for then there must be no unreasonable delay: 1 *J. J. Marshall* 344; 3 *Dana* 176; 1 *Day* 124; *Math. Pres. Evid.* 10, 415.

[Brock *v.* Savage.]

Now the Wilson title does not at all depend upon an implication from the entries in the Land Office books; but upon an express written contract which we have before us. The case of Strimpfler *v.* Roberts has, therefore, nothing to do with the question. But the general principle on which that case is founded has much to do with it; and that applies to both legal and equitable claims. It is the principle that lapse of time strengthens the title of the possessor and weakens that of a mere claimant. Long possession is inconsistent with unacknowledged claims, and a continual challenge of their validity.

If the patentees had taken the control and management of the land from the first, and held it ever since, without recognising the Wilson title, there can be no doubt that, like mortgagees in possession, or vendors in an executory contract of sale, they would have been relieved from the Wilson title long ago.

But the land has always been under the control and management of those claiming under Wilson. They have always paid all the taxes assessed on it; kept agents to watch it against all intruders; redeemed such parts as were at times sold for taxes; from time to time sold large portions of it; occupied and improved parts of it; had a controversy over forty years ago with persons claiming a part of it under the patentees, and as a result thereof, maintained their right and got releases for some thirty tracts, and without any claim for any others being then set up by the patentees; and their title has no otherwise been opposed by the patentees until the bringing of this suit in 1855. The fact that this particular tract was by mistake dropped from the tax lists during a large portion of the time, has no effect npon the general question.

The only reasonable view that can be taken of all this is, that the true title was regarded by the patentees as not being in them, but in Wilson and his assigns. Perhaps there was originally a lien on the title for the surveying expenses, &c.; but this not having been admitted, nor asserted by suit or by possession of the land, during so long a time, thrice twenty years, is presumed to be paid, and cannot now be asserted: *Math. Pres. Ev.* cc. 19, 20; 1 *Pa. R.* 420; 2 *Watts* 214; 9 *Serg. & R.* 379; 14 *Id.* 15; 7 *W. & S.* 70.

The possession that is required in order to bar such claims as this, which with us is not more efficacious than a mortgage, is not the continued, actual, resident, and hostile possession of a trespasser, that gives a title in twenty-one years; but a possession according to the nature of the thing possessed, under a contract relation, and continued until the statute or a legal presumption bars the remedy on the contract, or until equity or the law presumes that the duty owed by the person in possession has been released, satisfied, or abandoned.

[Brock *v.* Savage.]

There seems to have been no sort of dispute about the material facts of the case, and no harm was done by the instruction to find for the defendant.

If there was any defect in the direct proof of the agreement of 1794, it was fully supplied by the admission of its genuineness in the release of Young to Morgan in 1813, and by numerous other circumstances. Cresswell had no visible shadow of interest affecting his competency as a witness. His agency for the defendant for his lands, including this unseated tract, does not exclude him.

Judgment affirmed.