## OF THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA.

## JUNE TERM, 1883.†

## WHEELING.

VANGILDER v. HOFFMAN *et al.*

Submitted June 12, 1882—Decided June 30, 1883.

(*WOODS, JUDGE, Absent.)

1. Issues in chancery are not directed to enable the party to get additional evidence. (p. 8.)

2. No issue should be directed until the plaintiff therein has thrown the burden of proof on the defendant. (p. 8.)

3. If the circuit court improperly directs an issue, it may on the final hearing disregard the finding of the jury and enter such decree as to it seems right; and whether or not the issue was properly directed depends upon the state of the proofs at the time the order is made. If the court errs in this respect, such error may be reviewed and corrected by the Appellate Court. (p. 8.)

†The other decisions announced at this term were reported in volume xxi.
*Case submitted before his appointment.

4. If upon the state of the proofs at the time the issue is directed the bill should be dismissed, it is error to direct the issue; and though the issue be found in favor of the plaintiff, the bill should notwithstanding be dismissed at the hearing; and in such case, if the bill is not dismissed by the circuit court, it will be dismissed by the Appellate Court.   (p. 8.)

5. When there is such a conflict of evidence, that it is so nearly balanced as to make it doubtful, on which side is the preponderance, an issue ought to be directed; but when, though there be a conflict, it is not of such character, no issue ought to be ordered.   The conflict of the evidence must be regarded as of this character and justifying the direction by the circuit court of an issue, whenever on appeal the Appellate Court is so divided in opinion as to the weight of the evidence, that some of the judges think, that the isssue ought not to have been directed, because the evidence established clearly one state of facts, while others of the judges think, that the evidence establishes an opposite state of facts, as in the present case.   This marked diversity of opinion as to the weight of the evidence is itself sufficient to establish, that it is doubtful, on which side is the preponderance, and therefore in such case the order of the circuit court directing the issue ought not to be reversed.   (pp. 13, 42.)

6. Though a deed be absolute on its face, yet if it be shown by the circumstances surrounding the parties and by their parol declarations, that the land was conveyed as a security for money loaned, a court of equity will declare such absolute deed a mortgage; and when on the parol evidence it is doubtful, whether the conveyance should be regarded by a court of equity as an absolute deed or as a mortgage to secure a loan, the courts incline to hold it to be a mortgage; but if under the statute-law in force, when such transaction occurs, there is a forfeiture of the principal or interest, in cases of usury the court of equity, if a loan be shown, will presume, that the legal rate of interest was to be paid therefor, unless by clear and satisfactory evidence usury be established, but the same degree of evidence will not be required, as is required to convict in criminal prosecutions. (p. 15.)

7. If the proof offered to establish, that a deed absolute on its face was intended to secure a loan of money and was therefore a mortgage, consists only of the parol declaration of the parties, such proofs, in order to prevail, must be clear and strong, if it be unaided by proof of the situation and circumstances of the parties and their conduct prior to, at the time of or after the execution of the deed.   The following circumstances and facts have great weight in leading a court to the conclusion, that a deed absolute on its face is merely a mortgage:   First, that the grantor was hard-pressed for money, and that the grantee was a known money-lender; second, that the actual execution of the

deed was preceded by a negotiation for a loan of money by the grantee to the grantor; third, that the parties did not apparently consider or contemplate the quantity or value of the land, when the deed was made; fourth, that the price professedly given for the land on the face of the deed was grossly inadequate; fifth, that the possession of the land has remained with the grantor, whether rent be nominally reserved or not; and if no rent is even professedly reserved, this last circumstance is entitled to very great weight, if unexplained.  (p. 20.)

SNYDER, JUDGE, furnishes the following statement of the case:

This suit was instituted in the circuit court of Monongalia county, on 11th day of February, 1874, by John O. Vangilder against John H. Hoffman and L. S. Hough, trustee.  The bill alleges that prior to the 8th day of May, 1865, the plaintiff was the owner of ninety-six acres of land near Morgantown; that on said day he executed a trust-deed conveying said land to a trustee to secure the payment of his single bill to Joseph Grubb for one thousand dollars with interest from said date; that in May, 1868, plaintiff applied to the appellant, Hoffman, for the loan of money to pay off said trust-debt, and take a trust-deed on the land to secure him; that at first said Hoffman declined and said that he could not loan money at six per cent; but finally it was agreed that plaintiff should convey the whole of said land to appellant who was to pay said trust-debt and then reconvey to plaintiff all the land except about ten acres which appellant was to retain as a bonus in addition to six per cent. for the loan aforesaid, and to secure the said loan the plaintiff was to give a trust-deed on said land thus reconveyed to plaintiff; that in pursuance of said agreement the plaintiff and wife on the 10th day of June, 1868, conveyed said land to appellant, who on the 15th day of June, 1868, paid off said Grubb trust-debt then amounting to one thousand one hundred and twenty-four dollars and sixty-seven cents; that subsequently, on the 4th day of January, 1869, appellant conveyed to plaintiff seventy-one acres of said land retaining, against the protest of the plaintiff, twenty-five instead of ten acres, as had been agreed upon, and a lien was retained in said conveyance for one thousand one hundred and sixty-six dollars and eight cents, the amount of the Grubb debt paid by the appellant for the

plaintiff as aforesaid, with interest to that date and costs for stamps added; that the plaintiff complained that appellant had retained twenty-five instead of ten acres, but appellant agreed, that if plaintiff would pay him four hundred and fifty dollars he would convey fifteen of the twenty-five acres to wife of plaintiff, and the plaintiff thinking the appellant had him in his power consented to make the purchase, and on the 8th February, 1870, appellant conveyed to plaintiff's wife said fifteen acres; that of said four hundred and fifty dollars the plaintiff paid two hundred and eighty-three dollars and thirty-three cents in a note on one Dann and executed to appellant his note for the balance of one hundred and sixty-six dollars and sixty-six cents on four years' time with interest; that at the same time plaintiff and wife executed a trust-deed to defendant L. S. Hough as trustee on said seventy-one and fifteen acres of land to secure the aforesaid one thousand one hundred and sixty-six dollars and eight cents and one hundred and sixty-six dollars and sixty-six cents to appellant payable four years from said date with interest. The plaintiff then specifies a number of payments made by him on said trust-debts, which, he alleges, including the value of the ten acres of land retained by appellant and the four hundred and fifty dollars paid for the fifteen acres amount to the sum of one thousand nine hundred and thirty-seven dollars and eighteen cents, and that appellant still claims as unpaid on said debts one thousand and twenty-five dollars, and has caused the trustee to advertise said lands to be sold, on the 20th day of February, 1874, to pay said balance of one thousand and twenty-five dollars still claimed to be due him as aforesaid. The plaintiff charges that said debt is usurious and inequitable, and prays that the said "John H. Hoffman and L. S. Hough trustee be made defendants to this bill *and required to answer the same*, and that they be enjoined from making sale of said land under said deed of trust of February, 1870, until the future order of this Court, and that all said contracts and assurances made, directly or indirectly, in respect to the money specified in said deed of trust, being for the loan or forbearance of money at a greater rate of interest than six per cent." be declared null and void, and that upon the hearing of the

cause the defendants be perpetually enjoined from ever proceeding under said trust deed; "and that if necessary this cause be referred to one of the Masters of this Court to ascertain what amount has been paid by plaintiff to said Hoffman, which should be decreed to be restored to plaintiff," and that he may have other and general relief, &c.

Both the defendants answered the plaintiff's bill—the defendant Hough disclaiming any notice or knowledge of any usury, unfairness or illegality in the transactions relating to the trust-debts—and the defendant Hoffman giving his version of the matters alleged in the bill at much length. He claims that he purchased the plaintiff's land and afterwards resold him the seventy-one and fifteen acres; that he positively declined to make any loan to the plaintiff; that the whole transaction was *bona fide*, and entirely free from usury or any illegality whatever; that all the allegations of the bill charging usury or facts tending to show that there was any understanding or agreement for a lone of money at a greater rate of interest than six per cent. are absolutely and unqualifiedly false.

Both the plaintiff's bill and the answers of the defendants are sworn to.

A number of depositions were taken by both the plaintiff and the appellant, and on the 24th day of September, 1874, the " cause came on to be heard upon the defendants' motion to dissolve the injunction heretofore awarded in the cause, on the bill, exhibits, answers of the defendants, replication thereto, and was argued by counsel." On consideration whereof the cause was referred to a commissioner to ascertain the amounts paid by the plaintiff on the debts secured in the trust-deed of February, 1870, and what amount remains due the defendant Hoffman on said debts. And on the 23d day of September, 1875, the cause came on to be again heard upon the papers theretofore read, depositions, the commissioner's report, exceptions thereto, and on consideration it was ordered and decreed, "that an issue is herein directed to be tried at the bar of the court to determine, whether or no the transaction between the plaintiff and the defendant, Hoffman, of the 10th June, 1868, conveying the land in the bill described, and the payment of the

money on the 15th day of June, 1868, was an usurious loan of money from the defendant, Hoffman, to the plaintiff."

This issue was tried by a jury in March, 1877, and a verdict rendered finding that said transaction was usurious. The defendant, Hoffman, moved to set aside said verdict, upon the ground that it was against law and contrary to the evidence, which motion the court took time to consider and at the September term, 1878, overruled the same, and the said defendant excepted and tendered his bill of exceptions, in which all the evidence was heard on the trial of the issue is certified and made part of the record. An account was taken by a commissioner and his report filed, which was excepted to by the plaintiff and defendant, Hoffman, and on the 15th September, 1879, a final decree was entered perpetuating the plaintiff's injunction as to the whole of the debts in the said trust-deed of February, 1870, mentioned, except one hundred and sixty dollars and thirty-five cents with interest thereon from August 20, 1879, as to which said injunction was dissolved and costs decreed to the plaintiff.

The defendant, Hoffman, obtained from this Court an appeal from with *supersedeas* to the said decrees of September 23, 1875, September term, 1878, and September 15, 1879.

*Thomas D. Houston* and *P. H. Keck* for appellant.

*Berhshire & Sturgiss* for appellee.

SNYDER, JUDGE:

It is assigned as error by the appellant that the court erred in directing an issue in the cause. The appellee claims that the bill is framed for relief under the tenth section of chapter one hundred and forty-one of Code of Virginia while the appellant contends that it is a bill for discovery under the seventh section of said chapter. If the appellee is correct, that his bill entitles him to the benefit of the said tenth section, then, of course, there was no error in directing the issue, because, under that section the plaintiff is entitled as a matter of right to an issue—*Brockenbrough* v. *Spindle,* 17 Gratt. 21; *Davis* v. *Demming,* 12 W. Va. 246. If, however, the bill is one for relief under said seventh section the plaintiff

is not as a matter of right entitled to an issue, but must bring his case within the general rule governing a court of chancery in directing an issue.   It seems to be manifest that said bill was not drawn with reference to the relief afforded by said tenth section, because it makes no averment of ability to prove the usury alleged without discovery from the defendants ; but on the contrary, it is sworn to by the plaintiff and calls upon the defendants to answer which they could only do in such case under oath as they did.   And instead of asking for an issue, it prays for an order of reference to a commissioner to ascertain the overpayments made by the plaintiff to the appellant on account of said debt in order that the same may be restored to the plaintiff.   In *Davis* v. *Demming*, 12 W. Va. 246, this Court after a full and careful review of the authorities held, that the said tenth section is applicable only to bills to prevent the sale of property conveyed by deed of trust to secure a usurious debt.   And that the issue directed by this section is the sole object and not an incident of the suit.   The frame and prayer of the bill before us, being not for an issue, but for a discovery and equitable relief, it cannot be construed as having been filed under the said tenth section.   It is also held in *Davis* v. *Demming*, *supra*, that all bills in equity for relief against an usurious debt *unpaid*, not filed under said tenth section, must be regarded as brought under the seventh section of said statute.

It is evident that the pleader in the cause before us did not have a very distinct conception of the law or the form in which he might be entitled to redress, but that the relief sought by the bill is for an unpaid debt is manifest notwithstanding the vague and inconsistent averments. It avers that the defendant, Hoffman, still claims as due him one thousand and twenty-five dollars on the trust debt, and prays for an injunction to restrain the collection thereof. And moreover, if we look to the result of the proceedings had in the cause, we find that after expunging all the usurious interest there is still unpaid on the principal and legal interest of the said debt one hundred and six dollars and thirty-five cents.   I am, therefore, of opinion that the bill must be treated as having been filed for relief under the said seventh

section of the statute according to the rule laid down in *Davis* v. *Demming*, and that relief can only be had against so much of the debt as remains unpaid without interest.

It being, therefore, apparent that the plaintiff is not entitled to the relief provided in the said tenth section, he is not entitled to an issue as a matter of right. According to the general rules of equity practice in such cases did the court err in directing an issue in this case?

Issues are not directed to enable a party to get additional evidence, but where there is a serious conflict in the evidence leaving the fact in doubt and rendering it necessary to weigh the character and credibility of the witnesses; or where there is such a conflict of evidence, that it is so nearly balanced, as to make it doubtful on which side is the preponderance, an issue ought to be directed; but where, though there be a conflict, which is not of such a character, no issue ought to be directed. *Jarrett* v. *Jarrett*, 11 W. Va. 584.

"No issue should be ordered until the plaintiff has thrown the burden of proof on the defendant." *Beverly* v. *Walden*, 20 Gratt. 147.

The law is well settled in Virginia and this State that if the circuit court improperly directs an issue, it may on the final hearing disregard the finding of the jury and enter such decree as to it seems right, and the question whether or not the issue was properly directed depends upon the state of the proofs at the time the order is made. If the court errs in this respect, such error may be reviewed and corrected by the Appellate Court. *Wise* v. *Lamb*, 9 Gratt. 294; *Anderson* v. *Cranmer*, 11 W. Va. 562.

"In a chancery cause, if upon the state of the proofs at the time the issue is directed, the bill should be dismissed, it is error to direct it; and although the issue is found in favor of the plaintiff, the bill should, notwithstanding, be dismissed at the hearing." *Smith* v. *Betty*, 11 Gratt. 752; *Jarrett* v. *Jarrett*, 11 W. Va. 584.

Our next enquiry is, whether or not the proofs, at the time the issue was ordered, justified the court in making said order. At that time there were in the cause on behalf of the plaintiff but three depositions—that of plaintiff himself, of Protzman and of Weaver.

The plaintiff is examined, cross-examined and re-examined at great length covering over sixteen pages of the record. It could serve no useful purpose to give here his evidence in detail. It is deemed sufficient to say that it supports the allegations of his bill and sustains his claim as to the usurious character of the transaction between him and appellant.

*Protzman*, testified that he had had a number of conversations with · Hoffman about the terms, purpose and character of the transaction between plaintiff and Hoffman, and he gives almost identically the same version of it that is given by the plaintiff. The whole of his information, he states, was derived from conversations had with Hoffman when no one else was present, and he says he cannot give either the times when, or the places where, any of the conversations took place, except that he thinks one took place shortly after Hoffman conveyed the land back to plaintiff, another about the time Grubb was after plaintiff for money in the year 1868, and another in 1869.

*Weaver*, testified that he had had conversations with Hoffman in the spring and summer of 1868, about Hoffman loaning money to plaintiff—does not recollect how many conversations—that on one occasion—date not recollected—he, Hoffman and plaintiff met on the land, and plaintiff and Hoffman had a conversation to themselves and then called him as a witness and he says: The contract was that Hoffman was to loan plaintiff about one thousand one hundred dollars, on which he was to get six per cent. interest—plaintiff was to make Hoffman a deed for all the farm, and Hoffman was to deed it all back to plaintiff except eight or nine acres which Hoffman was to get as a premium for the use of that money. Witness could not give date of this conversation, and on cross-examination exhibited much ignorance of matters that ought to have been known to him if his recollection was reliable and the facts testified to by him had actually occurred in the manner stated by him—he stated that he had been in the employ of both the plaintiff and Hoffman, but was not then in the employ of either.

On the other side the appellant states in his deposition, that plaintiff applied to him for the loan of money, but he

positively refused to make any loan; that after repeated efforts on the part of plaintiff to get money from him and elsewhere without success, the plaintiff came to him and offered to sell him his farm—ninety-six acres—for a sum of money that would pay the Grubb debt for which it was about to be sold; this offer he accepted; and thereupon made an absolute and unconditional purchase of the land, and by deed, dated June 10, 1868, the plaintiff and wife conveyed it to him and, on the 15th of June, 1868, he paid off said Grubb debt, then amounting to one thousand one hundred and twenty-four dollars and sixty-seven cents, a price which he regarded the full value of the land at that time; that in January, 1869, about seven months after his said purchase, he sold to plaintiff seventy-one acres, being the whole of said land, except twenty-five acres, at the price of one thousand one hundred and sixty-six dollars and eight cents payable in five years with interest, and by deed, dated January 4, 1869, he conveyed said seventy-one acres to plaintiff; that over a year after this he sold to the plaintiff fifteen acres of the twenty-five acres, excepted from the former sale, at four hundred and fifty dollars, and conveyed the same to plaintiff's wife by deed, dated February 8, 1870, and immediately thereafter by deed, dated February 9, 1870, the plaintiff's wife conveyed said seventy-one and fifteen acres to L. S. Hough as trustee to secure the unpaid purchase-money then due on said lands, payable in four years from said date. The appellant filed a number of depositions of other witnesses the purport of whose testimony is that about the time the trust-deed of appellant matured, say about February, 1874, the plaintiff was making urgent efforts to borrow the money to pay off said trust-deed, but failed to get the money; and that he then made no complaint of the debt as being usurious, illegal or unjust.

The foregoing is the substance of the parol evidence in the cause at the time the issue was directed, and if that had been all the evidence at that time this Court could not, perhaps, hold that the court erred in ordering the issue. But it seems to me that the parol testimony of the plaintiff is utterly irreconcilable with the documentary proofs in the cause. By the deed of June 10, 1868, the plaintiff and wife

conveyed to the appellant absolutely the whole of the land, "for and in consideration of the payment in full of the amount of said trust and interest to the said Joseph Grubb." If the testimony of the plaintiff's witnesses is to be credited the conveyance of this land to appellant and a reconveyance from him to plaintiff for all of it except eight or nine acres were, by the agreement, to be dependent and simultaneous acts. But the incontrovertable fact is that no reconveyance was made to the plaintiff until January 4, 1869, seven months afterward; and then, instead of all except eight or nine acres being conveyed, only seventy-one acres are conveyed, the appellant retaining twenty-five and not eight or nine acres as it was agreed he should. The consideration expressed in this deed is one thousand one hundred and sixty-six dollars and eight cents to be paid within five years and for which a vendor's lien is therein retained. Again, more than a year after this, by deed, dated February 8, 1870, the appellant conveys to plaintiff's wife—not to plaintiff according to the alleged agreement—fifteen of the twenty-five acres excepted from the former deed, in "consideration of four hundred and fifty dollars paid as follows, viz: by assignment of Wm. Dann's note in favor of John O. Vangilder for two hundred and eighty-three dollars and thirty-three cents due in three years from 8th February, 1868, and also John O. Vangilder's note for one hundred and sixty-six dollars and sixty-six cents at four years from the 4th day of January, 1870." And then immediately after this purchase the plaintiff and wife, by deed, dated February 9, 1870, convey the said seventy-one and fifteen acres in trust to L. S. Hough trustee to secure the payment of the aforesaid two debts of one thousand one hundred and sixty-six dollars and eight cents and one hundred and sixty-six dollars and sixty-six cents to the appellant.

None of these conveyances contain any recognition of any agreement for a reconveyance of all or any part of the land to the plaintiff, and there is no pretense and not a scintilla of evidence that there was any separate or collateral instrument giving the plaintiff the right to purchase, or have a reconveyance of the land or any part of it. The whole claim of the plaintiff rests upon the mere verbal statement of the appellant gathered by witnesses from casual conversations.

Evidence consisting of the mere repetition or oral statements—and especially when made to and proved by persons having no interest in the subject of the conversation—is of the weakest and most unreliable character, and should be received with the greatest caution. And unless corrobarated by other proof, or aided by surrounding circumstances, it must be held insufficient to establish any material fact. *Horner* v. *Speed,* 2 Pat. & H. 616.

It is almost incredible that the plaintiff, in a matter of so much importance, should take the hazard of establishing his agreement by such testimony. Upon the faith of a mere verbal promise of the plaintiff, according to his pretension, he made an absolute conveyance of his whole estate, and then allowed the matter to rest, without complaint, for years and until he is about to be sold out; and even then he uses every effort to raise money to pay for land which by said agreement belonged to him, and only after every other resource has failed, does he attempt to set up his said agreement. In the case of *Davis* v. *Demming,* 12 W. Va. 246, and other cases where agreements for reconveyance have been enforced, there were collateral contracts in writing. The fact that there is no such written contract in this case is strong presumptive evidence that none such was made. It is no answer to say that the appellant would not give such a writing. The plaintiff does not claim that he ever even applied for one. And if the plaintiff's witnesses are to be credited, it is certain that the appellant had no desire to conceal the transaction or keep it secret; because he seemed to be proclaiming it on all occasions and in the presence of persons who were sure to make it known, and in a manner which showed, if not recklessness, at least, the absence of any caution or thought of concealment.

The plaintiff not only rested upon this verbal promise at the time, but after he knew the appellant repudiated any such agreement, he purchased and paid for a part of the very land which by said alleged agreement was his own property, and then, without a word of complaint to any one so far as the proof shows, he rested quietly for four years. And not only this, but after such notice, without even a protest, he continued to make large payments on the claims due appel-

lant, and actually paid thereon, at least, nine hundred and seventy-one dollars and sixty-two cents, the last of which was paid as late as December, 1873. If the alleged agreement were not otherwise sufficiently disproved, the long acquiescence of the plaintiff under the circumstances must be accepted as very potent evidence that no such agreement ever existed.

Further, considering that the relief sought in this suit arises out of the statutes of usury as they existed prior to the Code of this State of 1868, which are highly penal in their character, and that the defence of usury has always been regarded as an unconscientious defence, and while it is given full effect when satisfactorily established, it has never received the favor of either courts of law or equity, it does not seem to me that the plaintiff made a case which entitled him to an issue. Usury, being the sole ground of the relief sought, the plaintiff to entitle himself to invoke the aid of this Court, must establish the alleged usury by clear and satisfactory proof. *Brockenbrough* v. *Spindle*, 17 Gratt. 21.

Upon the whole evidence, therefore, which I have necessarily stated briefly and, perhaps, imperfectly, but all of which I have carefully examined and considered, I do not think the circuit court should, under the principles of law before stated, have directed an issue in this cause, but that it should have dismissed the plaintiff's bill. But two of the judges of this Court having come to directly opposite conclusions on the effect of the evidence, it would be uncharitable if not presumptuous for this Court or any member of it to conclude that the circuit court erred in directing the issue. Such a conclusion would be equivalent to holding that said court ought to have no reasonable doubt of the effect of evidence about which the members of this Court differ diametrically. Therefore, in view of the conflict and difference in the conclusions of the individual judges of this Court, I have no doubt that the circuit court properly ordered the issue in this cause.

. The jury having found the transactions referred to them usurious it follows necessarily that they found the said deed of June 10, 1868, to be a mortgage and not an absolute conveyance. And it appearing that the plaintiff has paid an

amount exceeding the principal sum loaned to him, the circuit court should have perpetuated the injunction as to the whole debt instead of dissolving it as to the one hundred and six dollars and thirty-five cents.

The only difference between brother Green and myself is as to the effect of the evidence. He thinks it fully proves that the deed of June 10, 1868, was a mortgage from which it results that the transaction was usurious. I, on the other hand, think it fails to establish that said deed was not in fact as it is in form an absolute conveyance. I think the transaction was a sale and not a loan and therefore was not usurious. This difference is a forcible illustration of the wisdom of the rule that in cases of this character the order of the inferior court directing an issue should be treated with much indulgence and should not be set aside by the Appellate Court arbitrarily, but only in cases of abuse and when there ought to be no reasonable doubt as to the effect of the evidence in the mind of a competent and careful judge.

I concur in the conclusions and law as announced by brother Green in his opinion, and that the decree of the circuit court should be reversed and an order entered to that effect according to the directions contained in said opinion.

GREEN, JUDGE:

The real question in controversy in this case is: Was the transaction between the defendant Hoffman and the plaintiff Vangilder, which resulted in the conveyance by Vangilder and wife to Hoffman made June 10, 1868, a usurious loan of money by Hoffman to Vangilder? The statutes of usury in this State, since the Code of 1868 took effect, are not penal, but when these transactions took place, the Code of Virginia of 1850 was in operation in this State, and under its provisions this suit is brought and seeks to impose a penalty or forfeiture on the defendant because of his alleged usury in this transaction.

There can be no question, that in such a case the usury should not be regarded as established, unless it is sustained by evidence clear and satisfactory. And in *Brockenbroug's Ex'r* v. *Spindle's Adm'r*, 17 Gratt. 21, Judge Moncure uses language, which might indicate that he thought the rule to be

applied in such a case, with reference to the degree of evidence, was perhaps the same as is necessary to establish guilt in a criminal case.    He says on page 33:    "The usury ought to be proved beyond a rational doubt to the contrary."    This however does not, I presume, really express his views; they are more clearly and accurately expressed on the preceding page, where he says:    "That strong and clear proof should be required to convict a man of usury, and subject him to the consequences of such conviction, is a proposition which rests on the plainest principles of law." This to my mind conveys a clearer view of the law in such a case, than the language he afterwards used, which I have quoted and which, if it stood by itself, might induce the inference, that the same degree of proof would be required to establish usury, where it was accompanied by a forfeiture, as it would to convict one of murder.

In *Porter* v. *Mount*, 41 Barb. 561, the judge refused to instruct the jury:    "That the evidence must satisfy the jury beyond any reasonable doubt, that there was usury in the transaction."    Judge Smith on page 427 says:    "The judge was asked to instruct the jury to apply to the evidence the liberal and benign rule, which juries are ordinarily instructed to apply in favor of the defendants to the evidence on criminal trials.    A verdict finding usury should doubtless be based on clear and satisfactory evidence, as it involves by way of penalty the loss of the whole debt, but I do not think the charitable rule of giving to defendants, in favor of life or liberty, the benefit of every reasonable doubt, should be extended to civil actions in such cases."    And the court approved of this refusal of the court below to give the instructions asked.

The true rule I take it is, that where by statute a penalty is imposed on the usurer, usury can be established only by clear and satisfactory proof; and that a simple preponderance of the evidence would not suffice to establish usury. The rule, which governs in criminal cases, that the evidence must prove the usury " beyond a reasonable or rational doubt," is not applicable and has not been and should not be adopted by the courts.

But while the courts in suits against parties to enforce

forfeitures under the statutes because of usury in cases of
doubt always lean against the usury, yet, if in the suit there
is involved the question, whether a particular transaction is a
mortgage or a sale absolute or conditional, in cases of debut
the courts of equity will always lean in favor of the mortgage.
See *Conway's Ex'or* v. *Alexander*, 7 Cranch 237; *Davis, Com-
mittee,* v. *Demming et at.,* 12 W. Va. 281; *Dougherty* v. *Mc Colgan,*
6 Gill & John. 275; *Flagg* v. *Mann,* 2 Sumn. 533; *Secrest* v.
*Turner,* 2 J. J. Mar. 471; *Edington* v. *Harper,* 3 J. J.
Mar. 354; *Crane* v. *Bonnell,* 1 Green's Chy. R. 264;
*Robertson* v. *Campbell,* 2 Call 421; *Poindexter* v. *Mc Cannon,*
1 Dev. Eq. Cas. 373; *Davis et al.* v. *Stonestreet,* 4 Ind. 101;
*Ruffier* v. *Womack,* 30 Tex. 332. In examining such a ques-
tion, the courts have always given the widest scope to the
evidence. The reasons for this are so well expressed by
Field, Judge, in *Pierce* v. *Robinson,* 13 Cal. 116, that I will
quote what he says, though it is lengthy. He says on this
subject in his syllabus:

"Parol evidence is admissible in equity to show, that a deed
absolute upon its face was intended as a mortgage; and the
restriction of parol evidence to cases of accident or mistake
in the creation of the instrument, is unsound in principle
and unsupported by authority."

On page 125 he further says: " As the equity upon which
the court acts arises from the real character of the transac-
tion, it is of no consequence in what manner this character
is established, whether by deed or other writing or by parol.
Whether the instrument, it not being apparent on its face, is
to be regarded as a mortgage, depends upon the circum-
stances under which it was made, and the relations subsist-
ing between the parties. Evidence of these circumstances
and relations is admitted, not for the purpose of contradict-
ing or varying the deed, but to establish an equity superior
to its terms. It is against the policy of the law to allow irre-
deemable mortgages, just as it is against the policy of the
law to allow the creation of inalienable estates. Under no
circumstances will equity permit this end to be effected,
either by express stipulation or the absolute form of the in-
strument. The rule which refuses the admission of parol evi-
dence to contradict or vary written instruments; is directed

to the language employed by the parties. The language cannot be qualified, but must be left to speak for itself. The rule does not exclude inquiry into the objects and purposes of the parties in executing the instruments. It may be shown for instance, that a deed was made to defraud creditors, or a release given to render a witness competent. The purposes and objects of the parties are considered by a court of chancery, and constitute a large ground of its jurisdiction, which will be exercised to restrain or effectuate them as may best promote justice. Thus a deed executed for a fraudulent purpose will be set aside; and, as it is the settled policy of a court of equity, admitting of no departure, never to permit a security to be converted by any cotemporaneous agreement into a sale, the purposes of the parties in giving and taking an absolute conveyance will be enquired into ; and when the rights of third parties have not intervened, a court of chancery will control the use of the instrument intended as a security, in the hands of the grantee, so as to effectuate its object. Unless parol evidence can be admitted, the policy of the law will be constantly evaded. Debtors under the force of pressing necessities, will submit to almost any exactions for loans of a trifling amount, compared with the value of the property, and the equity of redemption will elude the grasp of the court, and rest in the simple good faith of the creditor. A mortgage as I have observed is in form a conveyance of the conditional estate, and the assertion of a right to redeem from the forfeiture involves the same departure from the terms of the instrument, as in the case of an absolute conveyance executed as a security. The conveyance upon condition, by its terms purports to vest the entire estate upon the breach of the condition, just as the absolute conveyance does in the first instance. The equity arises and is asserted in both cases, upon exactly the same principles, and is enforced without reference to the agreement of the parties, but from the nature of the transaction to which the right attaches, from the policy of the law, as an inseparable incident."

From these views, which are most amply sustained by the authorities it must result, that whether an absolute deed will take effect as a mortgage, must depend on the real character

of the transaction and the nature of the consideration. See *Baldwin & Eskridge* v. *Jenkins & Lucas*, 23 Miss. 206; *Morris, Ex'or of Nixon*, 1 How. 118; *Wyman* v. *Badcock*, 19 How. 289. These decisions clearly establish this as the law.

Though a deed be executed conveying property absolutely, yet, if it can be shown, by the circumstances surrounding the case or by parol evidence, that the deed was executed as a security for an antecedent debt, payment of the debt will necessarily defeat the deed. So too, if the deed absolute on its face is shown by the surrounding circumstances or by parol proof to have been given as a security for money loaned, the courts of equity will always treat such absolute deed as a mortgage, and it will be defeated by the return of the money borrowed and the interest thereon. Such parol evidence does not contradict the instrument, but simply establishes the existence of a superior equity, which the grantor will not be allowed to disregard.

It is a great mistake to suppose, that the courts have treated as mortgages absolute deeds or have enforced, after the payment of the debt, a re-conveyance only where what was interpreted as an agreement for a re-conveyance was in writing, as in *Davis* v. *Demming*, 12 W. Va. 246. On the contrary the cases, in which on parol evidence and proof of the situation and surrounding circumstances courts of equity have treated as mortgages deeds absolute on their face, and where there was not a particle of evidence in writing to show, that a mortgage was intended, are exceedingly numerous. It is the settled practice, so far as I can ascertain, in every State in this Union as well as in the courts of the United States and England, that a deed absolute on its face may be declared by a court of equity as a mortgage, upon this being shown to be the real transaction by the simple parol proof of the situation of the parties and the surrounding circumstances, when the absolute deed was executed, though not a scintilla of written evidence be produced to show, that such absolute deed was intended as a mortgage.

The evidence thus admitted being extended to the mere verbal declarations of the grantor, made when the transaction was occurring or subsequently, the declarations being of such a character that the court might draw from them the

inference that the real nature of the transaction was a mortgage, and was not what it purported to be, either an absolute or conditional sale. Below I give a few of the very large number of cases, in which absolute or conditional sales of land in writing have been declared mortgages by courts of equity upon such parol proof only.

See *Stapp* v. *Phelps*, 7 Dana 297; bottom page 190; *Crane* v. *Buchanan et al.*, 29 Ind. 570; *Pierce* v. *Robinson*, 13 Cal. 117; *Lodge* v. *Turman et al.*, 24 Cal. 385; *Key* v. *McCleary*, 25 Iowa 191; *Moore* v. *Wade*, 8 Kan. 380; *Emerson* v. *Atwater*, 7 Mich. 12; *Johnson* v. *Huston*, 17 Mo. 58; *Sweet* v. *Parker*, 22 N. J. 453; *Strong* v. *Stewart*, 4 Johns. Chy. R. 167; *Walton* v. *Cronly*, 14 Wend. 63; *Van Buren* v. *Olmstead*, 5 Paige 9; *Horn* v. *Keteltas*, 46 N. Y. 605; *Hills et ux.* v. *Loomis*, 42 Vt. 562; *Mann* v. *Falcon*, 25 Tex. 271; *Hauser et al.* v. *Lash*, 2 Dev. & B. Eq. 212; *Bentley et ux.* v. *Phelps*, 2 Woodb. & M. 426; *Russel* v. *Southard et al.*, 12 How. 139; *Ross* v. *Norvell*, 1 Wash. 14; *Robertson* v. *Campbell & Wheeler*, 2 Call 421, (top page 354); *King* v. *Newman*, 2 Munf. 40; *Dubois et al* v. *Lawrence et al.*, 16 W. Va. 443.

The ground on which these and numerous other decisions to the like effect can be safely and properly rested, though it has not in all cases been so stated, is thus well stated by the vice-chancellor in *Stewart* v. *Parker*, 22 N. J. Eq. R. (7 C. E. Green) p. 457: "The efficacy of the parol evidence is not to establish an agreement to recovery, the specific performance of which the courts will enforce, but to establish the true nature and effect of the instrument by showing the object with which it was made. It is well settled that this may be done. The question is, whether the transaction was a sale and conveyance, or whether it is a security for a loan. Any means of proof may be used to show it to be the latter; the declarations of the parties; the relation existing between them; the value of the property compared with the money paid; the understanding that the sums advanced should be repaid, and the payment of interest meanwhile on the amount. The distinction between parol evidence to vary a written instrument, and parol evidence showing facts which control its operation, is employed to reconcile the allowance of such proof with the statute of

frauds and the general rules of common law: Deeds absolute on their face have frequently been deemed to be mortgages by this Court, and the grantors allowed to redeem. *Phillips* v. *Hulsizer*, 5 C. E. Green 308, and the cases there cited. In *Thornbrough* v. *Baker*, 3 Lead. Cas. Eq. 604, the general doctrines is expounded, and in the appended American notes illustrated at large; and the principles on which parol proof is allowed fully examined and explained."

The examination of these cases will show, that this parol proof thus freely admitted to establish, that a deed, really on its face an absolute or conditional sale, was according to the purpose and intention of the parties a mortgage, although purposely put in the form of an absolute or conditional sale, consisted largely of proof of the relative situation of the parties and of their surrounding circumstances and conduct. But parol declarations have been freely admitted, though, if unaided by the situation of the parties, their conduct and the surrounding circumstances, it would be difficult but not impossible to convert an absolute deed into a mortgage by the mere verbal declaration of the parties.

With reference to the situation of the parties, it has always been regarded as a very material fact tending to show, that the transaction was a mortgage and not a sale, that the grantor was in a needy condition and hard pressed for money; that the grantee was a known money lender; that the actual execution of the absolute deed was preceded by a negotiation for a loan; and the parties did not apparently contemplate the value of the land when the deed was made. Another very important fact, which raises a strong presumption in favor of the transaction being a mortgage is, that the price professed to have been given for the land, on the face of the deed, is a grossly inadequate price. This is often commented on by the courts as a strong circumstance to show, that an absolute sale was not intended; and though it was made to assume that form designedly, yet, the court being satisfied that the real transaction was a loan, will treat the absolute deed as a mortgage. The fact, that the possession of the land after the absolute deed of it was made, remained with the grantor, has always been regarded as a strong indication, that the real transaction was a mortgage; though it is usual

on the part of the vendee, to attempt to reconcile the incon-
sistency of the vendor remaining in possession by showing,
that he became the tenant of the vendee; and whenever this
is not attempted, this retention of the possession by ·the
grantor, after the absolute deed has been made, is always
regarded as going very far toward showing, that the real
transaction was a mortgage.

That these are the facts and circumstances surrounding
the parties, which are habitually considered as having a
strong bearing on the questions, whether an absolute or con-
ditional sale on the face of a deed is to be held a mortgage,
is fully illustrated by very many cases. I refer here to a few
of these cases to be found in the books, in which one or all
of the circumstances I have named, had been relied on as
strong grounds for raising a presumption, that the sale
though absolute on the face of the deed, was really but a
mortgage, and ought to be so held by a court of equity.

See *Todd* v. *Campbell et al.*, 32 Pa. (8 cases) 250; *Fuller* v.
*Parrish*, 3 Mich. 218; *Bentley et ux.* v. *Phelps*, 2 Woodb. & M.
426; *Sellers* v. *Stalcup*, 7 Ired. Eq. 13; *Hamet* v. *Dundass*, 4
Barr 178; *Russell* v. *Southard et al.*, 12 How. 139; *Conway* v.
*Alexander*, 7 Cranch 241; *Morris* v. *Nixon*, 1 How. 126; · *Ver-
non* v. *Bethell*, 2 Eden. 110; *Oldham* v. *Halley*, 2 J. J. Mar.
114; *Edvington* v. *Harper*, 3 J. J. Mar. 354; *Davis* v. *Stonestreet*,
4 Ind. 101; *Emmerson* v. *Atwater*, 7 Mich. 24; *Wilson* v. *Pat-
rick*, 34 Ia. 362; *Campbell* v. *Dearborne*, 109 Mass. 144; *Eng-
lish* v. *Lane*, Porter, (Ala.) 328; *Hills et al.* v. *Loomis*, 42 Vt.
562; *Wright* v. *Bates & Niles*, 13 Vt. 349; *Lock's Ex'or* v.
*Palmer*, 26 Ala. p. 312; *Davis, Com.*, v. *Demming*, 12 W. Va.
247, syl. 8; *Dubois et al.* v. *Lawrence*, 16 W. Va. 443, syl. 2.

Having laid down the principles of law, which should gov-
ern in determining, whether a deed absolute on its face
should be regarded by a court of equity as a mortgage, I
propose now to apply these principles to the determination
of the most important question in this cause; that is, whether
on the proofs in this cause, on the 23d day of September,
1875, the circuit court was justified in making the order to
try the issue; "whether or not the transactions between the
plaintiff and the defendant, Hoffman, of the 10th of June,
1868, conveying the land in the bill described, and the pay-

ment of the money on the 15th day of June, 1868, was a usurious loan of money from the defendant Hoffman, to the plaintiff."

When there is such a conflict of evidence as to make it doubtful on which side is the preponderance, an issue ought to be directed. This is the rule laid down by this Court in *Jarrett et al.* v. *Jarrett*, 11 W. Va. 585, syl. 15. Was there on this question, ordered to be tried by the jury, such a conflict as this in the evidence in the cause when this issue was ordered? Only four witnesses had been then examined; first the plaintiff himself, who proved that the transaction referred to in the issue, was a usurious loan of money to him by the defendant, Hoffman. He stated the facts substantially as set forth in the bill, and these facts have been stated in the opinion of Judge Snyder and need not be repeated; second, Protzman, who testified that in 1868 or 1869, he did not remember whether in the fall or spring, but it was about the time Joe Grubb was pressing Vangilder for his debt; he had several conversations with Hoffman. In the first conversation he told him, that he guessed he would have to furnish Vangilder with the money to help him out; and subsequently he told him, that Vangilder was to pay him for this money only six per cent. interest, and in addition thereto the six or eight acre lots next to Beck Swisher. Hoffman was to make him a deed for the whole land, and Vangilder was to re-convey to him all the land except these lots. He thought this last conversation was in 1869; but could not fix the date. The same thing in substance was stated in several different conversations. He was well acquainted with both Hoffman and Vangilder and also with the land, a part of which he at one time thought of buying, but did not buy it. This was about 1872. He then offered thirty-five dollars per acre for what he wanted to purchase. He did not state when these conversations took place nor who was present, not being asked any question in reference thereto, either by the plaintiff or by the defendant, though he was cross-examined.

The third witness, Weaver, testified, that he was well acquainted with Hoffman, and thinks he lived on his farm in 1868. In the spring or summer of 1868, he had several conversations with Hoffman in reference to his loaning Van-

gilder money. He thinks the first conversation was in Hoffman's office. He told him to go to Vangilder and see about the money Vangilder wanted to borrow, and say to him, if he wanted to borrow the money and would give him the two lots near Beck Swisher's, in addition to six per cent. interest on the money loaned, he would let him have the money. He saw Vangilder and told him what Hoffman said, and he agreed to Hoffman's proposition and he reported the conversation to Hoffman. Hoffman and Vangilder met by appointment and had a conversation together, they then called him up as a witness. Hoffman agreed to lend him about one thousand one hundred dollars at six per cent.; Vangilder was to make Hoffman a deed for his land and Hoffman was also to make him a deed, and Hoffman was to have the two lots near Beck Swisher's containing eight or nine acres, as an extra premium for the loan. He says, that Hoffman was to deed to Vangilder the farm, except these eight or nine acres reserved for his premium. He was a laborer in Hoffman's employment. He says on cross-examination, that he was not sent by Vangilder to Hoffman. He does not know where the deed from Vangilder to Hoffman was made, or what were the dates of these conversations with Hoffman, but it was before the deed was made. He did not know when he left Hoffman's employment, but he did not remain with him to the end of the year.

These were the only witnesses examined by the plaintiff, and no witness was examined by the defendant except Hoffman himself. His testimony is given at considerable length by brother Snyder, and it need not be repeated. In all important respects it was a contradiction of the testimony of Vangilder, Protzman and Weaver. Of course the evidence of both Protzman and Weaver, would be more likely to be erroneous on account of defective memory, than that of the plaintiff or defendant, both of whom were directly interested in these transactions and were parties to them. Still if Protzman is to be relied upon, and he is unimpeached, there is little probability of his being so far mistaken as that there could have been no loan of money, by Hoffman to Vangilder, at usurious rates of interest. His evidence is clear and positive, and too much in detail to justify the inference, that no

usurious transactions occurred between Hoffman and Vangilder, if this witness can be relied upon as truthful, and he is unimpeached and there is nothing which I can see in his statements, that are so improbable as to justify the belief that they are untrue. I attach no importance to his failure to state when these conversations occurred, or whether any one else was present besides him and Hoffman, as neither the plaintiff nor the defendant requested him to state when they took place or who was present. Nor do I think much importance can be attached to the fact, that he did not know whether these conversations occurred in the spring or in the fall, or whether in the year 1868 or 1869. It is perfectly natural, that after five or six years he should forget the dates of these conversations. But it is obvious from the conversations themselves, that one of them took place shortly before the deed was executed by Vangilder to Hoffman, and the others shortly subsequent thereto. So far as I can discover this witness was an intelligent man.

Nor can I see anything in the evidence of Weaver, which would justify the belief that he was testifying falsely. It It is true his testimony shows, that he was an ignorant man. But bearing in mind that he was but a laborer and an ignorant man, his cross-examination did not show such an ignorance of matters about which he ought to have known, as to justify an inference that he was testifying falsely. His ignorance of these matters, it seems to me, was not unnatural when we bear in mind, that he was testifying in reference to matters occurring five or six years before he was examined.

The testimony of Hoffman shows on its face, that he was a very intelligent witness, and it is impossible to reconcile his testimony with that of the plaintiff and his two witnesses. The conflict between them is such, that the only possible inference to be drawn is, that false statements were designedly made by the one side or other. They cannot both be regarded as truthful statements by the most charitable view which can be taken as to their failure of memory. The only inference which can be drawn is, that on the one side or the other there have been false statements designedly made.

There are however some minor matters, in which they do

not disagree.   Thus Hoffman states, that "he was applied to
by Col. James Evans, to know if he would loan John Van-
gilder money to pay off the Grubb debt." He says he was
also applied to by Peter Weaver, several times, for the same
purpose.   Weaver says, that Hoffman sent him to Vangilder
with a proposition of a loan.   But they both thus agree, that
Weaver was as he stated, a medium of communication
between the parties with reference to a loan of money.   And
Hoffman also says, that Vangilder himself made such appli-
tion and proposed to give him a bonus of eight acres of land
if he would loan him the money, and afterwards increased
his offer to ten acres.   He says, after due consideration, that
he refused this offer.   But both parties agree, that there was
prior to the completion of this transaction, a chaffering for
the loan of money by Hoffman to Vanguilder at usurious
interest.   Hoffman says, that he proposed to take the land
and pay off the Grubb debt.   He says Vangilder acceded to
this proposition, but Hoffman in his deposition states, that
there was an understanding when Vangilder agreed to this
proposition to the effect that he Hoffman would sell him
Vangilder a portion of this land adjoining the land on which
Vangilder lived; but Hoffman says there was no agreement
as to the quantity or price of the land, which he was to let
Vanguilder have.

It does strike me as highly improbable, that there should
be an agreement that Hoffman should re-convey a portion of
this land, and that there should not have been, as Hoffman
says there was not, any understanding as to the quantity of the
land to be re-conveyed, or the price which Vangilder was to
pay for it.   It is claimed however, that the circumstances
surrounding this transaction, the subsequent conduct of the
parties and the written evidence, which was before the court
when this issue was directed show, that the testimony in be-
half of the plaintiff, is utterly irreconcilable with what must
have been the real transaction, and establish clearly, that the
defendant Hoffman, in his testimony, stated the facts as
they must have really occurred; and therefore this issue
ought not to have been directed.

The simple fact, that the evidence which was before the
jury, was substantially the same as that before the court, it

all having been certified in the record, and that the jury found, that this transaction was usurious, and the court refused to set aside this verdict when asked, requires of us a careful examination of the surrounding circumstances and the documentary evidence, which was before the court when the issue was directed by the court, before we draw the conclusion, that they consist with and confirm the testimony of Hoffman, and are utterly irreconcilable with that of the plaintiff and of the two other witness, who sustained his statement. In stating the circumstances surrounding this transaction, I shall refer only to those stated by the plaintiff's witnesses and not contradicted by the defendant, Hoffman, but either expressly or impliedly admitted by him in his testimony, so that, whatever weight we give to the evidence of witnesses in this case, these facts may be regarded as unquestionably true.

The plaintiff, Vangilder, was a poor and improvident man and rather an ignorant one; his occupation was farming and chain making, blacksmithing I suppose is meant. The defendant, Hoffman, was apparently an intelligent man of considerable wealth; his occupation was farming and he was a lender of money, and known as such. It is true he denies, that he was at the date of this transaction a banker and broker; this denial being based on the fact, that he had then no license as such, he having afterwards got his license as a banker and broker with two others who furnished some capital; they together constituting a licensed partnership after this transaction, as bankers and brokers, but the evidence shows, that he was at the time of this transaction a lender of money and known as such to the community.

As to the situation and pecuniary circumstances of Vangilder, and his want of providence, Hoffman, in his deposition states: "I told him that in the way he was managing things, I did not think he would have a home of his own in a few years." Joseph Grubb, to whom Vangilder owed a debt of one thousand one hundred and twenty-four dollars and sixty-seven cents, then secured by a deed of trust on his land, was urging the payment of the debt, and threatening to have the land sold under the deed of trust. Vangilder, by others as well as in person applied to Hoffman to lend

him money to pay this debt to Grubb. This is admitted by Hoffman, and could not have been denied as it was capable of ready proof. Hoffman in his deposition says: "I was applied to by Col. James Evans, to know if I would loan John Vangilder the money to pay this debt. I was applied to again by Peter Weaver, several times, for the same purpose. Afterwards Vangilder, the plaintiff, applied to me in person to loan him the money to pay off this Grubb debt."

The deed made by Vangilder and wife to Hoffman, June 10, 1868, states on its face, that the consideration was the payment by Hoffman of the amount of this Grubb debt. Its amount was, including interest due on it, one thousand one hundred and twenty-four dollars and sixty-seven cents. While the value of the land is not clearly shown by the evidence, it is apparent from the depositions and proof then in the case, that this was a grossly inadequate price for this land then, if it could be regarded as a sale.

This tract of land contained ninety-six acres, and in less than two years and a half Hoffman sold twenty-five acres of it for one thousand one hundred and twenty dollars, or for just about what he gave for the whole tract. It is true that he had improved the land considerably, but as an offset to some extent to this, it is shown, that he sold more than half of this twenty-five acres at a small price, as is admitted in Hoffman's answer. We may certainly say on the proof then in this case, that this tract of land was certainly worth more than twice the amount of this Grubb debt, which was a lien upon it. Some of the estimates would make it worth three times as much as the Grubb debt. Now when this deed is considered in connection with the fact, that the consideration in it was so grossly inadequate and with the admitted fact, that there had been prior to its execution, negotiations for the borrowing of the exact sum secured in the deed one thousand one hundred and twenty four dollars and sixty-seven cents to pay off the Grubb debt, it certainly raises a very strong presumption, that the testimony on behalf of the plaintiff to show, that it was understood and agreed that it should be a mortgage to secure this one thousand one hundred and twenty-four dollars and sixty-seven cents, and not a sale of the land, represents the real transaction. If it had

been a sale of the land and not a mortgage, we would naturally have expected the consideration to be some multiple of the number of acres in the tract, as lands when bought are usually valued by the acre.

In this case, from the evidence the land was worth probably twenty-five dollars per acre, and if it had been a sale as is claimed, we would have expected the consideration named in the deed to be two thousand four hundred dollars, or some other even sum. But if this was intended as a mortgage, there was no necessity for any nicety in the valuation of the land nor indeed was there any necessity for any accurate inquiry as to the quantity of land in the tract, as it was ample security for the money loaned whatever might be the exact quantity of the land. And accordingly we find, that this land is described in the deed as containing one hundred acres more or less. The record discloses no real difficulty in ascertaining the true quantity in this tract, ninety-six acres, and there is no controversy about the quantity. This insertion of the quantity in round numbers as one hundred acres, seems to me as well as the naming of the price in dollars and cents, as indications that this transaction was not a real sale. Both of these circumstances are such as would naturally have occurred had this transaction been a mortgage, and neither of them would naturally have occurred had it been a sale.

Again it is proven by the testimony of Hoffman himself, that after this deed to him, though he was entitled to the immediate possession of the land according to the terms of the sale and of the deed, yet he took possession under the deed of only the two lots, which by the evidence of the plaintiff and his witnesses, he was to have as a premium beyond six per cent. for the money he loaned. These lots he commenced at once to improve, at a cost exceeding one hundred dollars. But the balance of the tract he did not take possession of in any manner, but it continued under the control of Vangilder, just as it had been before the deed was made. This circumstance is certainly a corroboration of the statement of the plaintiff's witnesses, that except as to these two lots this transaction was not understood to be a sale of the land, but only a mortgage to secure the money loaned.

These circumstances, first, that the alleged price was grossly inadequate; second, that the vendor remained in possession of the land, and third, that when the deed was executed there had been previous negotiations for a loan, are all circumstances, which the courts constantly regard as entitled to great weight to show, that an absolute deed is in reality a mortgage. It is so expressly laid down in the eighth syllabus in the case of *Davis, Committee,* v. *Demming et al.,* 12 W. Va. 247.

The following are a few of the many decisions, which have been rendered, in which some or all of these circumstances were regarded by the courts as entitled to great weight in deciding, whether a deed absolute on its face was a mortgage. See *Wilson* v. *Patrick et al.,* 34 Ia. 362; *Bentley et ux.* v. *Phelps,* Woodb. & M. 430, 431; *Sellers* v. *Stalcup,* 7 Ired. Eq. 13; *Russell* v. *Southard et al.,* 12 How. 139; *Davis* v. *Stonestreet,* 4 Ind. 102; *Ruffier* v. *Womack,* 3 Tex. 332.

If these were all the circumstances in the case, it seems to me the court on the parol evidence before it corroborated by these circumstances might well have decided itself, that this transaction was a mortgage and not an absolute sale. And under the rule we have laid down, he would not have been justified in ordering the issue. But there were other circumstances, which to a certain extent tended to show, that the position of the defendant, Hoffman, that this transaction was an absolute sale might be correct. According to the testimony of Vangilder and the two witnesses for the plaintiff, the absolute deed from him and his wife on June 10, 1868, was to have been followed at once by a deed from the vendee, Hoffman, to Vangilder, the vendor, of all the land except the two lots, which he was to reserve as a premium for his loan beyond the six per cent. interest; and in the re-conveyance to Vangilder, Hoffman was to reserve a vendor's lien or take some other lien for the amount of money he had loaned, bearing six per cent. interest. Now instead of this being done at once, no reconveyance of any part of this land was made for nearly seven months, that is, till January 4, 1869. When this re-conveyance however was made, so far as the vendor's lien was concerned, it corresponded with the statement of the plaintiff and his witness, and it reserved

the lien to secure the original amount loaned, that is, the one thousand one hundred and twenty-four dollars and sixty-seven cents paid to Grubb and the interest on it to January 4, 1869. This amounted then to one thousand one hundred and sixty-two dollars and nine cents. The vendor's lien was reserved for one thousand one hundred and sixty-six dollars and eight cents.

This exceeded the amount loaned by three dollars and ninety-nine cents, but this was a simple mistake of calculation as sufficiently appears from Hoffman's evidence. This sum, for which this vendor's lien is thus reserved in the deed of July 4, 1869, was called purchase-money, but was really it would seem the amount loaned to Vangilder to pay off the Grubb debt. But this deed differs from the contract, as proven by the plaintiff and his two witnesses in this important respect, that it conveyed to Vangilder only seventy-one acres, reserving to Hoffman twenty-five acres instead of these two lots of seven and eight acres. This deed of January 4, 1869, it is claimed, proves conclusively the truth of Hoffman's statement, that the deed of June 10, 1868, was an absolute sale to him of the entire tract of land for one thousand one hundred and twenty-four dollars and sixty-seven cents cash, and that this deed from Hoffman to him was as he says, a subsequent sale by him to Vangilder of this same tract, less twenty-five acres at the same price.

These twenty-five acres so reserved, were subsequently sold for nearly the same price, that is, for one thousand one hundred and twenty dollars. So that, according to that view, Vangilder sells his land to Hoffman, and in seven months thereafter re-buys about one half of it in value for what he got for the whole. In other words, he sells his land and in seven months re-purchases it at double price. This certainly seems in the highest degree improbable, unless it was the result of fraud and gross oppression on the part of Hoffman. But is it true, that these deeds do as it is contended that they do, clearly establish, that the first deed made by Vangilder to Hoffman, was an absolute sale of all his lands at half their value, and that there was no understanding or agreement, that any portion of it was to be reconveyed to Vangilder, as is testified by these witnesses for plaintiff?

Now Hoffman himself, in his deposition, does not pretend to deny entirely, that there was some understanding when this deed was made to him on June 10, 1868, for all this land, that he was not to reconvey to Vangilder a portion of it. Vangilder and his witness say, that he was to reconvey the whole of this land excepting the two lots of seven or eight acres, which he was to reserve as a premium for his loan; and that Vangilder, was in this reconveyance to secure on the land by a lien, what he had borrowed. Hoffman in his deposition admits, that this deed of June 10, 1868, was made to him "with the understanding, that he Hoffman would sell him Vangilder a portion of the land; that lay adjoining some other land that he Vangilder had, and upon which he resided." But he says, "there was no agreement as to quantity or the price of the land I was to let him have."

Now is not the statement of Vangilder and his two witnesses, that both the terms on which this reconveyance was to be made and the quantity and location of the land to be reconveyed, were then agreed on, far more probable than this story of Hoffman's? Of what possible value to Vangilder was it, when he was selling his land at half price, that there should be a reconveyance of a part of it to him, if as Hoffman says, he Hoffman was to convey only so much as he pleased and at such price as he pleased? It seems to me, that if there was any such understanding as Hoffman admits and in which he is confirmed by all the witnesses, then it would be almost certain, that the quantity and price of the land to be reconveyed must have been also agreed upon. Such an understanding, of which Hoffman speaks, if thus utterly indefinite, was really and in truth no understanding.

But how, it may be asked, can the delay of Vangilder in demanding this reconveyance, if there was such an understanding, be accounted for? In the first place he remained in the possession of all the land, which it was thus understood was to be reconveyed to him, and it is not pretended, that he was charged any rent for its use. This might well satisfy an ignorant man, who would probably attach but small value to the making of a deed, provided he was left in possession of the land and no claim to it was set up by Hoffman, for it must be remembered, that Hoffman only took possession of

that portion of the land, which Vangilder admits he was to retain; and supposing that Hoffman had no sinister purpose in view, he may well have postponed making this deed, as the widow's dower had not then been laid off and might possibly when laid off interfere with these lots, which Hoffman was to have. The decree assigning her dower, was according to Hoffman's answer, made February 3, 1869. It confirmed the report of the commissioners appointed to lay off the dower. They probably had performed their duty of laying off this dower prior to January 4, 1869, and thus the boundaries of the dower having been fixed, this obstacle, if it had been one, to the making of this deed to Vangilder, was removed.

But it is claimed, that the fact that twenty-five acres of the tract were not contained in this deed from Hoffman to Vangilder is conclusive proof, that there could not have been seven months before an agreement, that he was to reserve only two lots of seven or eight acres. In his bill, which is sworn to, Vangilder says, that he called Hoffman's attention to the fact, that the deed of January 4, 1869, to him by Hoffman, was not in accordance with the agreement between them, as it reserved too much land for Hoffman; and that Hoffman said he would make the matter right, that he intended to convey to Vangilder's wife fifteen acres; and this quieted his fears for the time being. This is denied by Hoffman, and it is not proven. But be that as it may, it seems to me, as Hoffman had then an absolute deed for his entire tract of land, and he Vangilder was as he might well suppose in Hoffman's power, the acceptance of this deed ought not necessarily to be regarded by the Court as conclusive evidence, that there never had been such a contract as was proven by the plaintiff and two other witnesses, especially when their statements had been so strongly confirmed by the surrounding circumstances, as well as by the conduct of the defendant Hoffman to that time in leaving Vangilder in possession of all the land except the two lots, which Vangilder claims, was all that Hoffman was to retain, and which two lots alone Hoffman had up to that time taken possession of or improved.

The same remarks apply to the conveyance of ten acres more for a consideration of four hundred and fifty dollars to

Vangilder's wife about a year afterwards, on February 8, 1870. Vangilder was then still in the power of Hoffman to as great an extent as he was when he accepted the first deed. The acceptance of these deeds certainly tend somewhat to sustain the statements of Hoffman, but it seems to me, that while their acceptance is in apparent conflict with the plaintiff's statement of the original contract, yet it is no more in conflict with it than the many admitted facts, to which we have referred, are in conflict with Hoffman's statement of the character of the original contract. But it does seem to me, that the conduct of the parties at the time the original contract was made and the circumstances, which then surrounded them, and their declarations made at that time, establish the real character of the transaction far more satisfactorily than do the conduct of the parties after an absolute deed had been made, and when one of the parties is within the power of the other; and that papers executed or received under such circumstances are really entitled to but little consideration, and by no means to be regarded as conclusively showing the real transaction.

These views are fully sustained by the authorities. It is a maxim of courts of equity, that "once a mortgage always a mortgage;" and this well established maxim does not cease to be applicable on the execution of the deed, but it will on the contrary invalidate a subsequent agreement tending to preclude the exercise of the right of redemption; and the burden of proof is always on the mortgagee to show, that a sale or release of a mortgager's equity of redemption was made deliberately and for an adequate consideration. See *Dougherty* v. *McColgan*, 6 Gill. & Johns. 275; *Mills* v. *Mills*, 26 Conn. 213; *Perkins* v. *Drye*, 3 Dana 174; *Hyndman* v. *Hyndman*, 19 Vt. 9; *Locke* v. *Palmer*, 26 Ala. 312–323; *Brown* v. *Gaffney*, 28 Ill. 149; *Baugher* v. *Merryman*, 32 Md. 185.

The law on this point is thus stated by Justice Swayne in *Villa* v. *Rodriguez*, 12 Wall. 339: "When the mortgager has conveyed to the mortgagee the equity of redemption, the law upon the right to redeem is guarded by a jealous and salutary policy. Principles almost as stern are applied as those, which govern where a sale by a *cestui que trust* to his trustee is drawn in question. To give validity to such a sale by a mortgager

it must be shown, that the conduct of the mortgagee was in all things fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. When confidential relations and the means of oppression exist, the scrutiny is severer than in cases of a different character. The form of the instruments employed is immaterial. That the mortgager knowingly surrendered and never intended to reclaim, is of no consequence. If there is vice in the transaction, the law while it will secure to the mortgagee his debt with interest, will compel him to give back that which he has taken with unclean hands. Public policy, sound morals and the protection due to those whose property is thus involved require, that such should be the law."

It is true, that the transaction of January 4, 1869, did not assume the shape of a sale or release of his equity of redemption by Vangilder to Hoffman, and it could not possibly have assumed this shape for the mortgage had been given the form of an absolute deed in the conveyance by Vangilder to Hoffman, of June 10, 1868. But if this conveyance was really a mortgage in its effect, as we have seen, there were very strong reasons for holding, that the deed from Hoffman to Vangilder of January 4, 1869, was in its legal effect a surrender or release of this equity of redemption, on the principles laid down by Judge Swayne in *Villa* v. *Rodriguez*, 12 Wall. 339. It has not, in the language of Judge Swayne, been shown "that the conduct of the mortgagee, Hoffman, was in all things fair and frank, and that he paid for the property what it was worth."

By the effect of the deed of January 4, 1869, Hoffman, the mortgagee, paid for this equity of redemption, worth more than one thousand dollars, really nothing at all; the only thing actually given for it was a loan of one thousand one hundred and sixty-six dollars for five years, for which loan the mortgager was required to pay interest at the rate of six per cent. per annum. The continued possesion of the land by the mortgager, Vangilder, for five years under

the deed of January 4, 1869, before he paid the purchase-money, can be regarded as no consideration for the surrender by Vangilder of his equity of redemption; for he was to pay for the land he retained its full value with interest thereon from the date of this transaction.

The evidence tending, as we have seen, to show, that the original transactions between Hoffman and Vangilder of July 1868 was a loan of money at usurious interest, secured by what was in the view of a court of equity a mortgage, though the instrument executed by Vangilder to secure this money was in the form of an absolute conveyance of his land to Hoffman, it is immaterial what was the form of the conveyance or instrument whereby Vangilder in effect surrendered his equity of redemption on January 4, 1869, for as Justice Swayne says on page 339 of *Villa* v. *Rodriguez:* "The form of the instrument is immaterial, and even if the mortgager knowingly surrendered and never intended to redeem his equity of redemption, it is of no consequence." And yet, this has been claimed as conclusive against him in the argument of this cause.

What we have said of this conveyance by Hoffman to Vangilder of seventy-one acres of his Vangilder's land, on January 4, 1871, applies of course with equal force to the conveyance of the fifteen acres on February 8, 1870. This, in effect, was but the completion of his Vangilder's surrender, without consideration, of his equity of redemption evidenced by the fact, that Hoffman then had him completely in his power, as both parties believed. It was but a consummation of what was commenced in January, 1869. The fact, that the plaintiff's evidence tending strongly to show, that the transactions of July, 1868, were in truth a loan of money by Hoffman at usurious interest, secured by what a court of equity would regard as a mortgage, "is utterly irreconcilable with the documentary evidence in the cause." So far from being conclusive evidence against this being a mortgage, executed to secure a loan at usurious interest, it is in my judgment entitled to very little weight; for as Justice Swayne says, the form of the instrument in such cases is immaterial.

As a matter of course, no usurer would allow the docu-

mentary evidence to be such as would show the transaction to be usurious. The drawing of the instruments in a form that would show, that there was no loan of money at usurious interest, is the ordinary and usual device resorted to by all usurers to conceal their violation of the usury laws. It is one of those devices, which the usury-statutes declare shall not avail. To hold, that this documentary evidence in such cases would be conclusive in favor of the usurer, would be a judicial repeal of the statutes against usury. The courts have ever been astute to discover and expose all such shifts and devices to avoid the usury laws.

It is certainly true, that all the documentary evidence in this cause is utterly irreconcilable with the idea, that the transaction between Hoffman and Vangilder was a loan at usurious interest secured by a mortgage, and is also at variance with all of the evidence on behalf of the plaintiff. But what of this? Is not this always the case? Could we ever expect it to be otherwise? Can a single reported case be found in which it has been held, that a transaction was a loan at usurious interest secured by a mortgage, where the documentary evidence was not in irreconcilable conflict with the parol evidence or with the circumstances surrounding the case, as I think they are in this case?

It is true, "that none of the conveyances contain any recognition of an agreement for a reconveyance of all or any part of the land, to the plaintiff, Vangilder;" and it is also certainly true, "that there was no separate or collateral instrument giving the plaintiff, Vangilder, the right to repurchase or to have a reconveyance of the land or any part of it." Nor could we have in such a case any right to anticipate, that these conveyances would have set out the real facts of the case, if this was a usurious loan. But it is not correct to say, "that the whole claim of the plaintiff rests upon the mere verbal statements of the appellant, gathered from casual conversations." It is also sustained by the positive testimony of the plaintiff himself, who was cognizant of all the facts, as well as by a witness, who was acting for one or both of the parties in the negotiation between them; and above all, it is strongly corroborated by the facts and circumstances surrounding the parties, and also by the admissions of the

defendant Hoffman, made in his deposition, that there was some understanding that a portion of the land was to be resold by him to Vangilder. When thus strongly corroborated, this parol testimony is not of the weakest and most unreliable character, whatever it might have been if not corroborated.

It is not to me incredible, that the plaintiff Vangilder an ignorant man, should in a matter of so much importance, take the hazard of thus establishing the agreement. The books are full of instances of just such conduct under like circumstances. Vangilder was about to have all his lands sold for cash, probably at a ruinous sacrifice. He could prevent this only by taking this hazard; for as a matter of course Hoffman would not lend him money at usurious rates of interest, if Vangilder had insisted, that the true nature of the transaction should appear on the face of the documentary evidence! If it had so appeared, Hoffman would have run the risk of almost certainly losing all the money which he had loaned. Nor is it strange, that the subsequent documentary evidence does not disclose the true nature of the transaction, for if it had, the same results would have followed. Neither is it surpassingly strange, that Vangilder should have permitted these subsequent deeds to exhibit the transaction as no loan of money at usurious interest, for when these subsequent deeds were executed both parties were convinced, that Vangilder was completely in the power of Hoffman; and he may well have been willing to suffer even the wrongs which he did rather than to suffer much greater wrongs.

It is a great mistake to suppose, that in all the reported cases, as in *Davis* v. *Demming et al.*, 12 W. Va. 246, where a re-conveyance has been directed, there was some collateral contract in writing. In very many of the reported cases such was not the case, as for instance in *Dubois* v. *Lawrence*, 16 W. Va. 443. The fact, that in this case there was no such written contract, had there been no usury in the transaction, would have been some evidence, that there was no such contract or understanding; but even then it would not have been such strong presumptive evidence, that it would not have been overcome by parol proof, such as appears in this case. If the contract was usurious, the fact that there

was no such written contract does not, it seems to me, afford any presumptive evidence that there was no such contract. It is not unusual for usurers by indiscreet conversations to disclose the true character of a usurious transaction. Even criminals are often convicted by their indiscreet conversations.

I can not attach much importance to the fact, that the plaintiff Vangilder acquiesced for so long a time in the alleged wrongs of the defendant Hoffman. Till the defendant Hoffman took steps to deprive Vangilder of the possession and use of his land, which he was enjoying without the payment of any rent, it does not seem to me unnatural, that Vangilder a poor and ignorant man, should not begin a litigation with Hoffman a wealthy and intelligent man. He instituted this suit, as soon as Hoffman undertook to exercise his pretended rights in such a manner as to subject him Vangilder to actual and real present injury; and this is all perhaps which could have been expected from him, when we consider the relative position of the two parties. Such acquiescence as this is far from conclusive.

In *Dubois et al.* v. *Lawrence et al.*, 16 W. Va. 443, there was an acquiescence of this character by Lawrence for twenty years, and yet it was not held as being conclusive against Lawrence by this Court; but an absolute deed was declared to be a mortgage, although it had been recorded twenty years without any attempt to have it so declared. This long acquiescence was not considered conclusive, because Lawrence had been permitted to remain in possession of the land, and the suit was instituted promptly when he was disturbed in the possession. So too was this suit promptly instituted, when Vangilder was about to be deprived of his possession. The time, which has elapsed in this case, was but a little over five years. But it is said, that if "it were conceded that there was in fact a parol agreement for a re-conveyance of a portion of this land, still it could not avail the plaintiff Vangilder, because the transaction was closed by the conveyance of June 10, 1868, and the payment of the money by Hoffman on July 15, 1868. And the plaintiff Vangilder could not enforce the specific execution of his parol agreement of a trust or interest in said land, as by the statute of frauds such an agreement is absolutely void; and a court of equity would not enforce such a trust."

The numerous cases which we have cited show, that in every State in this union as well as in England it is well settled, that the statute of frauds has no application in the case supposed. After what we have already said, it is useless to again refer by name to the many cases showing, that the statute of frauds is inapplicable to such a case, and that such agreements are constantly proved by parol evidence and enforced by courts of equity. The case of *Dubois et al.* v. *Lawrence et al.*, 16 W. Va. 443, is one of the very many cases, in which such parol agreements have been enforced. It is now too late to even suggest, that they will not be enforced.

The cases referred to as sustaining the position, that a court of equity will not enforce such a parol agreement are, *Lear* v. *Chouteau*, 23 Ill. 39; *Pinnock* v. *Clough*, 16 Vt. 500; *Patton* v. *Horn*, 1 Grant Cas. (Pa.) 301; *Botsford* v. *Burr*, 2 Johns. Chy. 405; *Irwin* v. *Ivers*, 7 Ind. 308; *Whiting* v. *Gould*, 2 Wis. 552; *Conner* v. *Lewis*, 16 Me. 268; *Harris* v. *Barnett*, 3 Gratt. 339. But these cases are in my estimation entirely foreign to the subject under discussion.

Though there are numerous cases, very many of which I have cited, expressly deciding, that such a parol agreement to re-convey land made, when an absolute conveyance is executed, will be enforced, or such absolute deed will be declared to be a mortgage upon parol proof only, and though not one case can be found, so far as I know, laying down a contrary doctrine, yet it is suggested, that we should establish the contrary doctrine from a fancied analagy to other cases, in which the statute of frauds has been decided to be applicable. I do not deem it necessary to review these cases cited. An examination of them will show, that they bear no analogy to the case before us, and the very courts in which they were all decided show by the numerous cases I have cited, that they regard them as entirely inapplicable to such a case as this, for all these courts have held, that an absolute deed may be shown by parol proof to be either a mortgage or a conditional sale, that is, a sale with a right on the part of the vendor to repurchase.

It is said however, that there was no consideration for such parol agreement and that it was therefore void. Was there not precisely the same consideration for it as exists in every

parol agreement to reconvey land? It is true, that no money was paid by Vangilder as a consideration for such parol agreement. But did he not convey to Hoffman his entire land, and was not this not only a consideration but a very valuable consideration for the money advanced, as well as for this parol agreement made at the same time to reconvey a part of the land?

It is argued, that the transactions of June 10, 1868, January, 1869, and of February, 1870, were entirely distinct transactions, having no connection with each other, and that if there was usury in the transaction of June 10, 1868, they were finally closed on June 15, 1868, when Hoffman paid the money; and there is no pretence, that there was any usury in these subsequent transactions or in the subsequent trust deed executed to secure debts contracted long after June 10, 1868. Of course this is true if there be no connection in these various transactions. But all the witnesses of the plaintiff testified, that the transactions of June 10, 1868, were not then concluded, but were to be concluded by a reconveyance of a part of said land by Hoffman to Vangilder; and the circumstances strongly show that this was the truth. These subsequent conveyances then were not independent transactions, but were a carrying out in an imperfect and wrongful manner of the original contract made January 10, 1868, which contract there is strong reason to believe was usurious. It is it seems to me not administering our statute law justly to assume, that defence of usury should always be regarded as an unconsionable defence and, that it should not receive the favor of either courts of law or equity; on the contrary this may be often the only defence, which can be made to defeat the grossest injustice and wrong. But, whether the defence should in any case be relied upon, is not a matter for the courts but for the borrower only to determine; and if it is relied upon, the courts do not, as I conceive, show any disfavor to such defence; but if the usury is shown, they will without reluctance or hesitation enforce the law.

It is true, that when by the usury laws the principal of the money was to be forfeited, the courts did require clear and satisfactory proof of the usury, though not such a measure of proof as we have shown is required to convict in a criminal

prosecution.    In this case, if the transaction of June 10, 1868,
between Hoffman and Vangilder was a loan at all, the proof
is full and conclusive, that a usurious rate of interest was de-
manded and paid.    The usurious extortion, if this were a
loan, is proven to have been nearly or quite one hundred per
cent.

Now while the leanings of the court are against holding a
loan to be usurious, yet, as we have seen, the leanings of the
courts in a case of this description is always in favor of a
conveyance being a mortgage rather than an absolute sale.
And if following this tendency of the courts we hold the
deed of June 10, 1868, to be a mortgage, then the proof is
full that it was tainted with usury, and the court could not
reach a contrary conclusion, no matter how strong its lean-
ing might be against the usury.

Upon the whole I am of opinion, that on the 23d of Sep-
tember, 1875, when the circuit court directed the issue to be
tried, whether there was usury in these transactions, there
was a conflict of evidence on the question, but it was of such
a character, that if the circuit court had without directing an
issue decided, that there was usury in these transactions, I
could not for that reason have been for reversing the decision;
and as a matter of course the lender, Hoffman, can not com-
plain, that this issue was ordered, and that he was afforded a
chance of mending his case and making it stronger before
the jury.    Had the jury determined, that there was no usury
in this transaction, then this Court would have had to deter-
mine, whether the circuit court erred in directing this issue;
for if the jury found otherwise, there would be no neces-
sity for us to determine, whether the circuit court erred in
directing this issue; as according to my view of the law and
the evidence it certainly did not err to the prejudice of the
appellant; but I will say further, that I do not think it com-
mitted any error in this case in directing this issue.    It is
true in my opinion there was a preponderance of evidence to
establish these transactions as usurious, still I cannot say,
that the evidence was not so nearly balanced as to leave some
room for doubt, on which side was the preponderance.    I
think the preponderance was in favor of the usurious char-
acter of this transaction, and that this preponderance is so

strong as to leave no doubt in my mind as to the real character of these transactions, and therefore with these views, had I been the circuit judge I should have decided, that there was usury in these transactions and would not have directed any issue to be tried by a jury. But the fact, that one of the members of this Court not only does not take this view of the facts in the case, but is of opinion, that the evidence, on which the circuit judge acted, showed so clearly, that the transactions were not usurious, that he not only ought not to have directed an issue to be tried by a jury, but should himself have decided, that there was no usury in the case, itself shows that the evidence was such as to raise in the minds of some a doubt, on which side was the preponderance, and therefore justified the circuit judge in the directing of the issue.

This great difference of opinion, as to what the facts in this case prove, is itself sufficient to satisfy my mind, that I must be mistaken in my own conclusion, that there is no doubt but that the preponderance of evidence is so decided as to render it not doubtful, on which side it is; and for this reason I think the circuit judge did not err in directing this issue to be tried by the jury. The evidence before the jury was substantially the same as that before the court when it ordered this issue; and of course my opinion is, that the verdict of the jury finding these transactions to be usurious ought not to be disturbed, it being in accordance with the weight of the evidence. It was therefore the duty of the circuit court to enter its decree in accordance with this verdict. This the circuit court in its decree of March 28, 1878, and September 15, 1879, appears to have attempted to do. But it seems to me to have erred in the conclusion it reached, because it did not properly comprehend what relief the plaintiff was entitled to, under the bill filed by him in this cause.

I concur with brother Snyder in his opinion, that this bill was not framed in the manner required, when relief is sought under section 10 of chapter 141 of the Code of Virginia, which was in force when these transactions took place; and I also concur with him in the opinion, that it was sufficiently well framed to bring it under the operation of the seventh section of this chapter, also in force at that time.

The measure of relief to be granted under this seventh section, is the forfeiture by the lender of all interest on the money loaned.   The language of the setion is: "The lender shall recover only his principal money or thing without interest, and pay the costs of suit."   This is the law which governs in this cause.   The evidence and the commissioner's reports show that in regard to the land conveyed to Hoffman, and not re-conveyed by Hoffman to Vangilder or to Vangilder's wife, as payment upon the principal of the debt secured by the deed of trust, as was proper, the entire principal of this debt had been paid off, as well as a portion of the legal interest thereon.   According to the final decree of the circuit court there was due on September 15, 1879, of this debt (principal and legal interest) only one hundred and six dollars and thirty-five cents with interest thereon from August 20, 1879.   And it is obvious, that if the payments made by Vangilder in money, land and other modes had been applied, as they should have been, to the principal of the debt, and no part to the legal interest thereon, the entire principal would have been paid off.

It is not necessary for us to determine the controversies in the court below as to the price, at which the land retained by Hoffman and not re-conveyed to Vangilder or to Vangilder's wife, should be charged to Hoffman as payments on said debt, as it is clear, that any reasonable price, which could be put on said land, would with the other payments made have paid off the principal of the debt due from Vangilder and secured by the deed of trust, which is all that is important in deciding this cause.

The circuit court of Monongalia county ought therefore by its final decree of September 15, 1879, to have simply decreed, that the injunction which it had granted should be perpetuated as to all the debts secured by it, and ought not to have excepted therefrom said one hundred and six dollars and thirty-five cents with interest.   This decree therefore of September 15, 1879, must be reversed and annulled; and the appellee Vangilder as the party substantially prevailing must recover of the appellant Hoffman his costs in this Court expended, and this Court must enter up such decree as the said circuit court should have done; that is, that the injunction awarded by S.

C. Lewis, judge of the then second circuit, on the 5th day of February, 1874, prohibiting the defendants, John H. Hoffman and Lycurgus S. Hough, trustee, from ever proceeding under said deed of trust by sale. or otherwise be perpetuated as to the whole of said debt, and do decide, that the transactions, out of which the debts secured by said deed of trust arose, were originally tainted with usury; that John H. Hoffman the defendant had a right under the deed of trust to enforce only the principal of the debts thereby secured; that the whole of said principal has been paid by the retention of lands conveyed by the plaintiff Vangilder and wife to him, and not by him reconveyed to said Vangilder or his wife, and by other payments made on said debt; and that therefore the plaintiff Vangilder do recover of the defendant Hoffman his costs expended in the circuit court of Monongalia.

PRESIDENT JOHNSON AND JUDGE SNYDER CONCURRED IN THE CONCLUSION REACHED BY JUDGE GREEN, AND PRESIDENT JOHNSON CONCURRED IN HIS OPINION.

DECREE REVERSED.